1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

10   FRANTZ SAMSON,                          CASE NO. 2:19-cv-00175

11                    Plaintiff,              ORDER GRANTING CLASS
                                             CERTIFCATION
12          v.

13   UNITED HEALTHCARE SERVICES
     INC.,
14
                     Defendant.
15

16

17

18          This matter comes before the Court on Plaintiff's Renewed Motion for Class

19   Certification. ("Mot." (Dkt. No. 172).) Having reviewed the Motion, Defendant's Opposition

     ("Opp." (Dkt. No. 204), the Reply (Dkt. No. 226), the Surreply (Dkt. No. 234), and all other
20
     supporting documents and materials, and having held oral argument on October 5, 2023, the
21
     Court GRANTS Plaintiff's Motion and CERTIFIES two classes.
22

23

24

**BACKGROUND**

The TCPA prohibits "any person . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . ." 47 U.S.C. § 227(b). Plaintiff Frantz Samson alleges that Defendant, United HealthCare Services ("United') violated the TCPA by placing calls using an artificial prerecorded voice to call cellular telephone numbers without the prior express consent of the party being called. (Mot. at 4.)

Samson filed suit in 2019 and now seeks to have two classes of similarly-situated individuals certified. The Court reviews the salient factual allegations and then addresses the allegations specific to class certification.

A.   <u>Factual Allegations</u>

Samson began receiving automated calls from United in July 2018 after receiving a new cell phone number. (Mot. at 2; Declaration of Jennifer Rust Murray, Exhibit 2 (Dkt. No. 173-2).) Samson told United it had the wrong number when he received the calls. (Mot. at 2; Murray Decl. Ex. 7 (Dkt. No. 173-7).) He asked United to stop calling and to take him off the calling list, but the calls continued. (<u>Id.</u>)

Samson alleges that he received calls from three of United's internal teams: the Community & State National Retention team, the Medicare and Retirement Non-Licensed Retention team, and the Medicare and Retirement Collections team. (Mot. at 3.) The different teams are relevant because of the different automatic dialing systems they use, their impact on Samson's TCPA claims, and for the purposes of limiting the classes. United utilizes automatic dialing systems, two of which are the LiveVox IVR system and the Avaya Dialer, to call and

leave prerecorded messages to recipients. (Mot. at 3-4; Murray Decl. Ex. 5 (Jeanette Dep. at 41:13-14, 42:22-43:9); Ex. 4 (Frazier Dep. at 109:18-111:22).) United's Collection team uses the LiveVox IVR system to play prerecorded messages to recipients, whereas United's other teams use the Avaya Dialer to automatically dial consumers who are loaded onto a list of members to be called for specific "campaigns." (Id.) Following these calls, United employees can enter a disposition code, which documents the outcome of that call. (Mot. at 3, 5; Murray Decl. Ex. 14 (Expert Report of Anya Verkhovskaya at ¶¶ 34, 36) (Dkt. No. 173-14); Ex. 17 at UHC0000152 (Dkt. No. 173-17). ) "Wrong number" and "do not call" are two such codes. (Mot. at 5; Murray Decl. Ex. 8 (Dkt. No. 173-8).)

**B.**     **Allegations Relevant to Class Certification**

This is Samson's second motion for class certification, filed after the Court lifted a stay that was put in place pending the outcome of three similar cases filed in the Eastern District of California. (See Dkt. No. 93.) Samson moves to certify two classes that are similar, but not identical to, his initial classes:

> Wrong Number Class: All persons residing within the United States who, between January 1, 2015, and the date of class certification, received a non-emergency telephone call(s) from one of the UnitedHealthcare teams that called Plaintiff Samson, to a cellular phone through the use of an artificial or prerecorded voice, and who, according to Defendant's records, was not a UnitedHealthcare member at the time of the call.

> Do-Not-Call Class: All persons residing within the United States who, between January 1, 2015 and the date of class certification, received a non-emergency telephone call(s) from one of the UnitedHealthcare teams that called Plaintiff Samson, to a cellular phone through the use of an artificial or prerecorded voice, and whose telephone number, according to Defendant's records, was flagged or documented as "do not call," "final do not contact" or otherwise recorded as a number not to be called.

(Mot. at 10.)

Samson argues both classes are suited for certification because common proof can be used to demonstrate that members of each class received calls from United in violation of the TCPA. And given that consent remains central to TCPA claims, Samson asserts that common evidence from United's records can resolve any disputes as to each class member's consent to be called. Specifically, United's call logs show a lack of consent when there is either a "wrong number" or "do not call" disposition. (Mot. at 16.)

United argues against certification, claiming that individualized issues would predominate over common issues. (Opp. at 1.) United puts forth three arguments against certification. First, United contends that Samson's reliance on "wrong number" and "do not call" disposition codes do not suffice to show lack of consent. Rather, United claims that a call-by-call analysis would have to occur in order to determine whether it had consent to call any given class member. (Id. at 1-2.) Second, United argues that the TCPA has several healthcare exemptions, which would need to be considered on a call-by-call basis. (Id. at 2.) And finally, United argues that the Court would have to determine whether state law preempts the TCPA, and in doing so, would have to do a preemption analysis for all 50 states and apply them to the relevant calls. (Id.)

### ANALYSIS

Before the Court examines the merits of Samson's Motion, the Court first considers United's objections to the class definitions and its contention that Samson lacks standing.

**C.**     **Class Definitions**

United makes two arguments regarding the scope of the class definitions. First, United claims that Samson expanded his class definitions and asks the Court to narrow them. ("Opp." at 19-20.) Samson's prior definition limited the classes to those who received calls from United via

1    its Avaya dialer or LiveVox IVR dialing system. (Id. at 19.) As proposed, the class definitions

2    now include people who received calls from the same teams that called Samson regardless of the

3    dialer used. United also argues the definitions also expand the class period from 2019 to the date

4    of this Court's ruling on certification. United argues that expanding the definitions and class

5    period means additional calls, campaigns, and dialers could be at issue in the case that were not

6    subject to prior discovery. (Id. at 5.)

7          The Court agrees to modify the classes to include the two specific automatic dialers at

8    issue. This is consistent with the Court's discretion to modify the classes. See Rosas v.

9    Sarbanand Farms, LLC, 329 F.R.D. 671, 693 (W.D. Wash. 2018) (citing Armstrong v. Davis,

10   275 F.3d 849, 872 (9th Cir. 2001) ("The Court has discretion to modify class definitions where

11   appropriate."). By adding the names of the specific automatic dialers – the Avaya dialer and the

12   LiveVox IVR dialing systems - the class definitions more narrowly target those individuals who

13   are similarly-situated to Samson, who received calls from both automatic dialers. Samson does

14   not contest this narrowing of the classes and, indeed, his briefing refers only to the Avaya Dialer

15   and the LiveVox IVR dialing systems. The Court therefore revises the class definitions to name

16   those two specific systems given that they are the only two relevant automatic dialers. The Court

17   also revises the class definitions to specify which three teams called Samson for the purposes of

18   clarity.

19         As to the expanded class period, the Court finds that given extensive discovery has

20   already occurred in this case it would be unfair to United to expand the class period and require

21   additional discovery. The original class period proposed was January 9, 2015 to January 9, 2019

22   – a four year period stretching to the day the action was filed on January 9, 2019. (Amended

23   Complaint at 6 (Dkt. No. 82); (Complaint (Dkt. No. 1-2).) When Samson filed the current

24

1   Motion to Certify, he requested the Court certify classes spanning from January 1, 2015 to the

2   date of this Court's certification. (Mot. at 10.) However, in support of his oral argument, Samson

3   now requests the Court change the class period from January 1, 2015 to October 29, 2019 for the

4   Wrong Number class, and from January 1, 2015 to October 20, 2019 for the Do Not Call class.

5   (Pl. Demonstrative Slides for Oral Arguments at 19-20 (Dkt. No. 264).) The Court does not

6   know if the different ending dates were made in error, but absent an explanation accepts these

7   are the dates Samson requests. To avoid the need for additional discovery and avoid prejudice to

8   United, the Court agrees to narrow the class period from January 9, 2015 to January 9, 2019.

9          Second, United argues that Samson proposes impermissible "fail-safe" classes. (Opp. at

10  12.) United is incorrect. Fail-safe classes are commonly defined "to include only those

11  individuals who were injured by the allegedly unlawful conduct." Olean Wholesale Grocery

12  Coop., Inc. v. Bumble Bee Foods LLC, 31 F.4th 651, 669 n.14 (9th Cir.), cert. denied sub nom.

13  Starkist Co. v. Olean Wholesale Grocery Coop., Inc., 143 S. Ct. 424 (2022). "Such a class

14  definition is improper because a class member either wins or, by virtue of losing, is defined out

15  of the class and is therefore not bound by the judgment." Id. (internal quotation and citation

16  omitted).

17         United's argument here fails because the class definitions are defined using objective

18  criteria that do not simply mirror the TCPA claim elements. Though Samson's class definitions

19  loosely track the elements of a TCPA claim, they are not "fail-safe." Both classes are defined

20  using objective criteria, for instance by "wrong number" and "do not call" disposition codes,

21  which do not necessarily identify those injured by the unlawful conduct because the question of

22  consent must still be litigated and proven at trial. Because Samson will have to prove more facts

23

24

ORDER GRANTING CLASS CERTIFCATION - 6

1  to establish liability than are referenced in his class definitions, the Court finds he has not

2  proposed fail-safe classes.

3  **D.**   **Standing**

4         United argues that Samson does not have standing to represent either class. United's

5  argument lacks merit because Samson alleges Article III injuries consistent with both classes.

6         Article III limits federal judicial power to "Cases" and "Controversies," U.S. Const. art.

7  III, § 2, and standing to sue "limits the category of litigants empowered to maintain a lawsuit in

8  federal court to seek redress for a legal wrong," Spokeo, Inc., v. Robins, 578 U.S. 330, 337

9  (2016). To satisfy Article III standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2)

10 that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be

11 redressed by a favorable judicial decision." Spokeo, 578 U.S. at 337. A plaintiff establishes

12 injury in fact if he or she suffered "an invasion of a legally protected interest that is concrete and

13 particularized and actual or imminent, not conjectural or hypothetical." Id. at 339 (internal

14 quotation and citation omitted).

15        United argues that under the new expanded class definitions, Samson fails to establish

16 standing under both proposed classes because he never received a prerecorded call, and does not

17 claim he ever received a non-emergency pre-recorded call. (Opp. at 21.) This is incorrect. A

18 United employee testified that United called Samson in November 2018 using the IVR system.

19 (Murray Decl. Exhibit 5 (Jeanette Dep. at 83:10-84:1).) Samson also provides evidence from

20 United's records that this November call is labeled as pre-recorded, for educational purposes,

21 and made after United entered "do not call" and "wrong number" dispositions for Samson.

22 (Murray Decl., Exhibits 8, 16 (Dkt. No. 173-16).)

23

24

1    At the hearing on Samson's Motion, United argued that the November call does not count

2    because it falls into the "emergency" exceptions category. (Def. Demonstrative Slides for Oral

3    Arguments at 6-7 (Dkt. No. 263).) United claims the November call was a "LISLoss" call,

4    designed to inform members that their insurance coverage was ending. (Id.) United cites to

5    Dennis v. Amerigroup Washington, Inc., No. 3:19-CV-05165-RBL, 2020 WL 618472 (W.D.

6    Wash. Feb. 10, 2020), for the premise that other Courts have previously found LISLoss calls

7    exempt. But the emergency exceptions issue in Dennis was decided at summary judgment, and

8    was determined as a matter of liability, not standing. The court there also noted that Amerigroup

9    was not at fault for that call regardless because it was the first call placed to the plaintiff after the

10   number was reassigned. Dennis, 2020 WL 618472 at * 7. The court did not discuss if

11   Amerigroup would have been liable had it had actual knowledge that the number belonging to its

12   member had been reassigned. As discussed in more detail below, the Federal Communications

13   Commission ("FCC") has previously stated that callers may still be liable under the TCPA if

14   they call someone without consent even if it is for emergency purposes. See In Re Rules &

15   Reguls. Implementing the Tel. Consumer Prot. Act of 1991, 2023 Declaratory Ruling at 7.

16   Because the applicability of the emergency exception for the November call speaks more to

17   liability than standing, and because Samson has demonstrated he was called by an artificial,

18   prerecorded voice and after United entered "wrong number" and "do not call" notations for his

19   number, the Court finds Samson has established standing for both classes.

20   **E.    Class Certification Standard**

21   Courts must undertake a "rigorous analysis" of all the Rule 23 factors to determine

22   whether to certify a class. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350-51 (2011). The

23   plaintiff must first meet all four requirements in Rule 23(a): numerosity, commonality, typicality,

24

1    and adequacy of representation. <u>See Leyva v. Medline Indus.,</u> 716 F.3d 510, 512 (9th Cir. 2013);

2    Fed. R. Civ. P. 23(a).

3         The plaintiff must also satisfy one of the Rule 23(b) factors. Here, Samson seeks

4    certification under the "predominance" standard of Rule 23(b)(3). To obtain certification of a

5    class action for money damages under Rule 23(b)(3), a putative class must establish that "the

6    questions of law or fact common to class members predominate over any questions affecting

7    only individual members . . ." <u>Amgen Inc. v. Conn. Ret. Plans & Tr. Funds</u>, 568 U.S. 455, 460

8    (2013). Samson must demonstrate predominance and superiority under Rule 23(b)(3) by

9    preponderance of the evidence. <u>Olean</u>, 31 F.4th at 665 (concluding that "plaintiffs must prove the

10   facts necessary to carry the burden of establishing the prerequisites of Rule 23 are satisfied by a

11   preponderance of the evidence.") In making this determination, "the court must make a rigorous

12   assessment of the available evidence and the method or methods by which plaintiffs propose to

13   use the class-wide evidence to prove the common question in one stroke." <u>Id.</u> at 666 (internal

14   quotation and citation omitted).

15        United argues Samson fails to meet the typicality, adequacy, and predominance

16   requirements of Rule 23 in its opposition to class certification. The Court focuses primarily on

17   these criteria.

18   **1.      Numerosity**

19        Numerosity exists when "the class is so numerous that joinder of all members is

20   impractical." Fed. R. Civ. P. 23(a)(1). "The numerosity requirement requires examination of the

21   specific facts of each case and imposes no absolute limitations." <u>Gen. Tel. Co. of the Nw. v.</u>

22   <u>Equal Emp. Opportunity Comm'n</u>, 446 U.S. 318, 330 (1980). There is no challenge to

23   numerosity, and United's records show that there are over 45,000 members in each class. (Mot.

24

1   at 10; Declaration of Jodi Nuss at ¶¶ 8-19) (Dkt. No. 176).) The Court finds the numerosity

2   requirement of Rule 23(a)(1) is met. See A. B. v. Hawaii State Dep't of Educ., 30 F.4th 828,

3   836–37 (9th Cir. 2022) (finding a prospective class of 300 members satisfied numerosity).

### 2.   Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." A

proposed class satisfies the commonality requirement if there is at least one question of fact or

law common to the class. Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to

demonstrate that the class members have suffered the same injury." Wal-Mart, 564 U.S. at 349–

50 (citation and quotations omitted). To satisfy commonality, the claims must depend on a

common contention "that is capable of class wide resolution." Id. at 350. "What matters to class

certification . . . is not the raising of common 'questions'—even in droves—but rather, the

capacity of a class-wide proceeding to generate common answers apt to drive the resolution of

the litigation." Id. (citation and quotation omitted).

Commonality is satisfied because there are significant questions of fact or law common

to class members – a point United does not challenge. Samson argues the common questions are

(1) whether United used a prerecorded voice to make calls to class members; and (2) whether

United is liable for calls made to wrong or reassigned numbers, and for calls to individuals who

previously told United not to call. (Mot. at 11-12.) These questions are applicable to the classes

Samson seeks to certify. The Court finds commonality is satisfied.

### 3.   Typicality

United makes two arguments challenging Samson's typicality, both of which are

attenuated and lack merit.

1    To demonstrate typicality, a plaintiff must show that the named party's claims are typical

2    of the class. Fed. R. Civ. P. 23(a)(3).  The Supreme Court has recognized the "commonality and

3    typicality requirements of Rule 23(a) tend to merge." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S.

4    147, 157 n.13 (1982). The Ninth Circuit has described typicality as a "permissive standard[]".

5    Staton v. Boeing Co., 327 F.3d 938, 957 (9th Cir. 2003) (internal citation and quotation omitted).

6    "Typicality refers to the nature of the claim or defense of the class representative, and not to the

7    specific facts from which it arose or the relief sought." Parsons v. Ryan, 754 F.3d 657, 685 (9th

8    Cir. 2014). "[R]epresentative claims are 'typical' if they are reasonably coextensive with those of

9    absent class members; they need not be substantially identical." Staton, 327 F.3d at 957 (internal

10   quotation and citation omitted).

11   The Court agrees with Samson that his claims are typical of the proposed classes.

12   Samson's claims arise from United's same course of conduct and are based on the same legal

13   theories that are typical of both classes. For the Wrong Number class, Samson and unnamed

14   class members are not members of United and received calls from United after alerting it that it

15   had the wrong number. Similarly, for the Do Not Call class, Samson and unnamed class

16   members received calls from United after United entered a "do not call" disposition code. For

17   both classes, Samson has the same or similar alleged injury as other class members based on

18   United's same conduct.

19   United argues that Samson is atypical of the Do Not Call class because he is not a United

20   member and in United's view, the class contains only United members. (Opp. at 22.) But the Do

21   Not Call class is not limited to United members. Membership in the Do Not Call class turns on

22   whether United entered a "do not call" disposition code, and whether that is sufficient to show

23   lack of consent, not whether the class members are also United members. Because Samson has

24

1   demonstrated that he received a call after United entered a "do not call" disposition code for his

2   number (Murray Decl., Exs. 8, 16),  the Court finds Samson's claim typical for the Do Not Call

3   class.

4          United also asserts that Samson's interests fundamentally differ from United members

5   because he seeks to recover damages even if that might cause other United members' insurance

6   premiums to go up if United is forced to pay a judgment. (Opp. 22; (Declaration of Maxwell

7   Pritt, Exhibit 19 (Deposition of Frantz Samson 58:16-20) (Dkt. No. 214-19).) This argument is

8   wholly speculative and irrelevant to the Court's inquiry. See Parsons 754 F.3d at 685 (noting that

9   the relief sought is not relevant to typicality). The Court finds this argument fails for two reasons.

10  First, United fails to put forth any evidence to suggest that paying damages in this case will

11  affect its ability to provide services to members or that paying damages will result in members

12  paying more in insurance. Second, United's argument simply assumes what class members might

13  believe without providing any support for this assumption. Because United has failed to show

14  that Samson's interests fundamentally differ from other class members, and because relief sought

15  is not relevant to typicality, the Court finds it poses no impediment to the Court's finding that

16  Samson's claims are typical of both classes.

17         **4.    Adequacy**

18         United fails to convince the Court that any of its attacks to Samson's adequacy as a class

19  representative has merit. Both Samson and his counsel satisfy the adequacy requirement.

20         The adequacy requirement is satisfied if the named plaintiff will fairly and adequately

21  protect the interests of the class. Fed. R. Civ. P. 23(a)(4). In determining this Rule 23

22  requirement, the Court asks: "(1) [d]o the representative plaintiffs and their counsel have any

23  conflicts of interest with other class members, and (2) will the representative plaintiffs and their

24

1   counsel prosecute the action vigorously on behalf of the class?" <u>Staton</u>, 327 F.3d at 957 (internal

2   citation omitted). The adequacy requirement "is aimed at protecting the due process rights of

3   absent members who will be bound by a class action judgment." <u>Farrell v. Bank of Am., N.A.</u>,

4   327 F.R.D. 422, 428 (S.D. Cal. 2018) (citing <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1020 (9th

5   Cir. 1988).

6     The Court finds Samson is an adequate class representative. He has worked closely with

7   counsel to develop the class claims. (Mot. at 13; Murray Dec. ¶ 9.) He has responded to

8   discovery and been deposed. (<u>Id.</u>) He has also participated in mediation, including by attending a

9   mediation session in person. (<u>Id.</u>)

10     United argues that Samson is an inadequate representative because he has a criminal

11   history and provided "false testimony." (Opp. at 23.) This misleading argument fails to persuade

12   the Court against finding Samson adequate.

13     "Most courts have rejected the contention that a proposed representative is inadequate

14   because of prior unrelated unsavory, unethical, or even illegal conduct." 1 NEWBERG ON

15   CLASS ACTIONS § 3.68 (6th ed.); <u>In re Computer Memories Sec. Litig.</u>, 111 F.R.D. 675, 682

16   (N.D. Cal. 1986) (noting that within the Ninth Circuit, "[c]haracter attacks . . . not combined

17   with a showing of a conflict of interest have generally not been sympathetically received" and

18   that the existence of a conflict of interest is the most important consideration). "Only when

19   attacks on the credibility of the representative party are so sharp as to jeopardize the interests of

20   absent class members should such attacks render a putative class representative inadequate."

21   <u>Harris v. Vector Mktg. Corp.</u>, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010) (internal quotation

22   and citation omitted). While a putative representative's credibility may be a relevant

23   consideration, it is only disqualifying when it is "on issues directly relevant to the litigation . . ."

24

1  In re Arris Cable Modem Consumer Litig., 327 F.R.D. 334 (N.D. Cal. 2018) (citing Harris, 753

2  F. Supp. 2d at 1015).

3        Relying entirely on precedent from outside the Ninth Circuit, United argues that Samson

4  "has engaged in a pattern of abuse of the judicial system" and is therefore not a person who

5  would fairly and adequately represent the interest of the classes. (Opp. at 23.) In support of this

6  argument, United points out that in 2010, Samson "stole" from a bowling alley by allegedly

7  refusing to rent shoes. (Pritt Decl. Ex. 19 (Samson Dep. at 14:8-23).) Samson pled guilty to a

8  charge of third degree theft and received a deferred sentence. (Pritt Decl. Ex. 20 at 5 (Dkt. No.

9  214-20).) Samson failed to pay the fines and it appears the court was unable to locate him to get

10  in touch about the fines. (Id. at 3.) In 2011, the court revoked Samson's deferred sentence, closed

11  the case and found Samson guilty. (Id. at 2.) Samson explained that he was unable to pay the

12  restitution due to being unemployed. (See Pritt Decl. Ex. 19 (Samson Dep. at 19:20-20:22).) He

13  was also unaware that a payment plan was available, and did not know that he needed to alert the

14  court when he moved. (Id.) He did not attempt to hide this information. (See, Pritt Decl. Ex. 19

15  (Samson Dep.); Supplemental Declaration of Jennifer Rust Murray, Exhibit 39 at 6 (Dkt. No.

16  227-7).) This prior conduct does not convince the Court that Samson cannot adequately represent

17  the classes. The transgression occurred over a decade ago without further wrong-doing that

18  would evince a pattern of criminal behavior. The misdemeanor theft is entirely unrelated to the

19  TCPA violations and Samson's inability to pay restitution is equally unrelated. United's attempt

20  to escalate these issues into ones of criminal significance fail and the Court is unconvinced it

21  bears on Samson's adequacy as a class representative.

22        The Court is equally unconvinced by United's argument that Samson is inadequate

23  because he "falsely testified" during his deposition about being sued for failing to pay rent. The

24

1    record contradicts United's argument. Samson was also one of several tenants who was sued by

2    their landlord for failing to pay rent. (Pritt Decl. Ex. 21 (Dkt. No. 214-21).) When asked if he had

3    ever had a civil complaint filed against him, Samson responded "not to my knowledge." (Pritt

4    Decl. Ex. 19 (Samson Dep. at 15:9-11).) When shown the complaint, Samson's memory was

5    refreshed, and he answered United's questions about the complaint. (Pritt Decl. Ex. 19 (Samson

6    Dep. at 21:21-23; 22:24-23:12).) There is nothing to suggest Samson testified falsely that he did

7    not recall the complaint filed against him or that he was attempting to conceal this information.

8    Samson's answer reflects both the passage of time and his limited understanding of what a civil

9    complaint is.

10        Lastly, the Court finds Samson's counsel are adequate to represent the classes – a point

11   United does not contest. In determining adequacy of class counsel, the Court must also assess the

12   following requirements of Rule 23(g):

13       (i) the work counsel has done in identifying or investigating potential claims in the
          action;

14

15       (ii) counsel's experience in handling class actions, other complex litigation, and the types
          of claims asserted in the action;

16       (iii) counsel's knowledge of the applicable law; and

17       (iv) the resources that counsel will commit to representing the class.

18   Fed. R. Civ. P. 23(g)(1)(A). The Court may also consider "any other matter pertinent to

19   counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P.

20   23(g)(1)(B). And class counsel must "fairly and adequately represent the interests of the class."

21   Fed. R. Civ. P. 23(g)(4).

22        Samson is represented by three law firms – Terrell Marshall Law Group PLLC, Francis

23   Mailman Soumilas PC, and Shub & Johns LLC. A representative from each firm provides details

24   regarding their experience, knowledge of the applicable law, and a willingness to provide the

1   resources necessary to represent the class. (Murray Decl.; Declaration of James Francis (Dkt. No.

2   174); Declaration of Jonathan Shub (Dkt. No. 175).) The attorneys have also been with this case

3   since its inception, conducted discovery, and began the litigation process after the stay was lifted.

4   (Murray Decl., Francis Decl., Shub Decl.) For these reasons, the Court finds Samson and his

5   counsel meet the adequacy requirement.

6        **5.**      **Rule 23(b)(3) – Predominance**

7        Rule 23(b)(3) requires not just that some common questions exist, but that those common

8   questions predominate over individual ones. The "predominance inquiry tests whether proposed

9   classes are sufficiently cohesive to warrant adjudication by representation." <u>Amchem Products,</u>

10  <u>Inc. v. Windsor</u>, 521 U.S. 591, 623 (1997). "This calls upon courts to give careful scrutiny to the

11  relation between common and individual questions in a case." <u>Tyson Foods, Inc. v. Bouaphakeo</u>,

12  577 U.S. 442, 453 (2016). "An individual question is one where members of a proposed class

13  will need to present evidence that varies from member to member, while a common question is

14  one where the same evidence will suffice for each member to make a prima facie showing [or]

15  the issue is susceptible to generalized, class-wide proof." <u>Id.</u> (citation and quotations omitted).

16  Defenses that must be litigated on an individual basis may defeat class certification. <u>Wal-Mart</u>,

17  564 U.S. at 367. But "[w]hen one or more of the central issues in the action are common to the

18  class and can be said to predominate, the action may be considered proper under Rule 23(b)(3)

19  even though other important matters will have to be tried separately, such as . . . some

20  affirmative defenses peculiar to some individual class members." <u>Tyson Foods</u>, 577 U.S. at 453.

21  The party seeking class certification has the burden of establishing predominance. <u>True Health</u>

22  <u>Chiropractic, Inc. v. McKesson Corp.</u>, 896 F.3d 923, 931 (9th Cir. 2018).

23

24

1    The main dispute about predominance is the issue of consent. Prior express consent is an

2    affirmative defense in TCPA claims. True Health, 896 F.3d at 931. The ability to show consent, or

3    the revocation thereof, on a class-wide basis is crucial to the predominance inquiry. Because the

4    analysis is different for the proposed classes, the Court discusses them separately. The Court also

5    addresses United's challenges to predominance concerning call exceptions and the McCarran-

6    Ferguson Act.

7        **a.    Wrong Number Class**

8        United argues individualized consent issues will predominate for the Wrong Number

9    class because Samson cannot rely on United's records to show lack of consent. The Court

10   disagrees.

11       Demonstrating prior "express consent" is an affirmative defense for which the defendant

12   bears the burden. True Health, 896 F.3d at 931. Typically, consent can be shown through an

13   enrollment form, a contract or some evidence showing an agreement to be contacted. See id. at

14   932-33; Van Patten v. Vertical Fitness Grp., LLC, 847 F.3d 1037, 1045 (9th Cir. 2017). Since

15   United bears the burden of demonstrating consent, the court assesses predominance "by

16   analyzing the consent defenses United has actually advanced and for which it has presented

17   evidence." True Health, 896 F.3d at 931.

18       United makes two arguments that its consent defenses will raise individualized issues that

19   would defeat predominance. First, United argues that there is no way to distinguish United

20   members from non-members except on a call-by-call basis. (Opp. at. 9.) But Samson's expert,

21   Anya Verkhovskaya, proposes a methodology for dealing with this issue. Verkhovskaya states

22   she can determine who had a telephone number at a given time by utilizing data processors such

23   as LexisNexis, TransUnion, Tel-Lingua, MicroBilt, and Experian. (Rebuttal Expert Report of

24

1    Anya Verkhovskaya to Expert Report of Sonya Kwon at 23 (Dkt. No. 173-26).) She will use this

2    reverse lookup service to determine if a name and associated physical address exists for each cell

3    phone number appearing in United's records at the time the calls were made. (Id. at 23-26.)

4    Verkhovskaya has tested this methodology and found that the data is reliable, with an accuracy

5    range of 86% to 97%. (Id. at 23.) And to ensure the data is accurate, following the reverse lookup

6    process, Verkhovskaya will coordinate a telephone carrier subpoena process to obtain the

7    user/subscriber's name and address associated with the telephone numbers in question during the

8    relevant time period. (Id. at 33.) The information obtained via the subpoena process would be

9    cross-checked against the information found from the reverse lookup to confirm potential class

10   members' identities and remove all United members' telephone numbers. Given the layers of

11   cross-checking for this process, the Court finds Verkhovskaya's proposed methodology provides

12   a class-wide means of distinguishing between members and non-members and avoiding the

13   consent issue United raises.

14          United argues that Verkhovskaya's methodology is unreliable, which would in turn lead

15   to a potential ascertainability issue. (Opp. at 24.) United's most persuasive argument is that

16   Verkhovskaya's calculation of the data processor's accuracy range is incorrect. (Opp. at 25.)

17   According to United's expert, Sonya Kwon, the data processors utilized by Verkhovskaya have

18   error rates from 20% to 70%, well above Verkhovskaya's 14% estimated error rate. (Declaration

19   of Maxwell Pritt, Exhibit 28 at 16 (Rebuttal Expert Report of Sonya Kwon) (Dkt. No. 214-28).)

20   Kwon included a table in her analysis to demonstrate that when using the data processors to look

21   up a number and the owner of that number during a specified time period, she found

22   inconsistencies among the data. (Id. at 17, Table 10.) This table included specific examples

23   where the data processors were inconsistent for certain proposed class members. This means the

24

1  data processors could give conflicting information about who owns a certain number at a given

2  time, making it difficult to ascertain class members.

3         There are three flaws in Kwon's criticism. First, Kwon does not address the validity of

4  Verkhovskaya's subpoena process as a way to cross-check the data processor results. The

5  information obtained via subpoena adds an additional means to confirm the results and account

6  for any discrepancies between the data processors. Second, Verkhovskaya's report states that she

7  would remove any records where there is a conflict between the data processor and the subpoena

8  information, thus eliminating any unconfirmed numbers. (Verkhovskaya Rebuttal Report at 35-

9  36.) Third, "[c]ourts have repeatedly recognized the adequacy of reverse lookup methodologies

10  to satisfy Rule 23(b)(3)'s predominance requirement" in TCPA cases. Williams v. PillPack LLC,

11  343 F.R.D. 201, 211 (W.D. Wash. 2022) (citing cases). Given Verkhovskaya's ability to cross-

12  check results, and the general acceptance of this methodology, the Court finds Verkhovskaya's

13  methodology sufficient at this stage in the litigation.

14         United's second argument is that "wrong number" dispositions have multiple meanings,

15  and consent defenses would require call-by-call inquiries. (Opp. at 10.) United identifies various

16  deposition transcripts and declarations from United employees to support its argument that a

17  wrong number disposition code does not show lack of consent. (Id. at 10). For example, United

18  contends that often times members will tell United callers they have reached a wrong number as

19  a way to avoid dealing with a delinquent account, which in turn gets coded as "wrong number."

20  (Id.) But this argument only applies to members, who are not part of the class and should be

21  screened out through Verkhovskaya's methodology.

22         United also claims that many members are Dual Special Needs Plan ("DSNP") Members,

23  which means they are dually eligible for both Medicare and Medicaid. (Declaration of Kevin

24

McGavick at ¶¶ 2-3 (Dkt. No. 205).) United states that DSNP members are frequently homeless, disabled and lack stable housing and therefore will often give the numbers of relatives, friends and neighbors who consent to receive calls on their behalf, and that sometimes those individuals mistakenly identify the calls as misdirected. (Opp. at 10-11; McGavick Decl. ¶¶ 4, 8; Declaration of Jennie Carter ¶ 11, 24-25 (Dkt. No. 206); Declaration of Miranda Schutt ¶ 4 (Dkt. No. 208).) But this argument lacks sufficient evidence to defeat predominance. Kevin McGavick, United's Vice President and 30(b)(6) designee, simply testified that "[s]ometimes non-members consent to receive calls on behalf of a . . . member." (McGavick Decl. at ¶ 14) He provides no information as to how often that happens or how frequently those calls are misidentified. Jennie Carter, who is employed as a business manager for United's Medicare & Retirement Collections team, similarly informs that Court that 51% of the DSNP members have responsible parties that have the authority to make medical decisions for them, but then states that more broadly many members use the number of a friend, neighbor, caretaker or relative they live with or near as the member's contact number with that person's consent. (Carter Decl. at ¶¶ 23-24.) Again, this tells the Court nothing about how often these types of calls lead to an incorrect "wrong number" disposition. As such, United has put forth no evidence that the Court can use to determine whether this issue would defeat predominance.

Because Samson has proposed a class-wide methodology for determining non-United members for the Wrong Number class, and United has not demonstrated consent issues will result in individualized issues predominating, the Court finds that Samson has demonstrated predominance for the Wrong Number Class.

1        **b.**    <u>**Do Not Call Class**</u>

2        Unlike the "Wrong Number" class, the "Do Not Call" class is not limited to non-

3 members. This changes the Court's analysis in one critical way. Where the "Wrong Number"

4 class started with the presumption that non-members had not given their consent to be called, the

5 "Do Not Call" class includes class members who are also United members, and who did provide

6 consent to be called. Therefore the analysis turns on the revocation of consent. United argues that

7 Samson's reliance on its disposition codes to show revocation is misplaced and that determining

8 whether a member truly revoked consent to be called would require individualized trials. The

9 Court finds United fails to put forth sufficient evidence to demonstrate that individualized issues

10 will defeat predominance.

11        The TCPA permits consumers to revoke their prior express consent, but "revocation of

12 consent must be clearly made and express a desire not to be called or texted." <u>Van Patten</u>, 847

13 F.3d at 1048. When assessing whether a particular means of revocation was reasonable, courts

14 look to the "totality of facts and circumstances surrounding that specific situation, including, for

15 example, whether the consumer had a reasonable expectation that he or she could effectively

16 communicate his or her request for revocation to the caller in that circumstance, and whether the

17 caller could have implemented mechanisms to effectuate a requested revocation without

18 incurring undue burdens." 30 F.C.C. Rcd. 7961, 64 n.233 (2015 Order). The Ninth Circuit has

19 previously held that declarations and deposition testimony can provide sufficient evidence that

20 individualized consent issues would predominate. <u>True Health</u>, 896 F.3d at 932 (finding

21 variation in communication and relationships with putative class members as evidenced through

22 declaration and deposition testimony sufficient to support denial of class certification under Rule

23 23(b)(3)). Though United has the initial burden of proving prior express consent, "[l]ogic would

24

1    dictate that . . . plaintiffs have the burden to prove that such consent was revoked." <u>Saulsberry v.</u>

2    <u>Meridian Fin. Servs., Inc.</u>, No. CV146256JGBJPRX, 2016 WL 3456939, at *11 (C.D. Cal. Apr.

3    14, 2016).

4         The Court agrees with Samson that common, class-wide evidence will resolve the Do Not

5    Call class's claims. Samson points to common evidence that United's "do not call" dispositions

6    demonstrate revocation of consent. (Mot. at 16.) Samson also points to United's policy that

7    informs staff not to call people with a "do not call" disposition. (Reply at 4.) The policy states

8    that "UnitedHealthcare does not make outbound calls to those Members who have a 'Do Not

9    Call' preference captured in the processing system." (Murray Decl. Ex. 23 (Dkt. No. 179-17).

10   The disposition codes, along with United's own policies are common proof that will be used to

11   show revocation of consent on a class-wide basis.

12        In opposition, United argues that "do not call" disposition codes do not demonstrate

13   revocation of consent and cannot be relied on as class-wide proof. (Opp. at 7.) United asserts that

14   "do not call" dispositions get entered for a number of reasons, "including: (i) a call agent's

15   judgment that calls should be suspended because the member was in the hospital, jail, or

16   otherwise unavailable; (ii) member disinterest in a particular campaign; or (iii) member inability

17   to take advantage of a campaign's benefits." (<u>Id.</u> at 7-8.; McGavick Decl, ¶ 11; Carter Decl. ¶¶

18   18-20; Deposition Transcript of Laura Reuden at 122:4-23 (Dkt. No. 214-2); Deposition

19   Transcript of Jennie Jeanette at 86:22-87:1 (Dkt. No. 214-4).) United argues that the unreliability

20   of its records would require call-by-call inquiries to determine if a member actually revoked

21   consent to be called or if the disposition refers to the member's disinterest or inability to

22   participate in the campaign being called for.

23

24

1    United's argument falls apart because the evidence it cites applies on a class-wide basis

2    and it does not show how any individualized issues would predominate. United  supports its

3    argument with call records and testimony from supervisors who discuss "do not call"

4    dispositions in broad strokes. (See Def. Demonstrative Slides for Oral Args. at 15-20.) For

5    example, United's 30(b)(6) designee, United's Vice President, stated "[a] "do not call"

6    disposition code has subjectivity and interpretation by our individual call agent. . . [it] does not

7    necessarily have the same meaning." (See Pritt Decl. Exhibit 1 (Deposition of Kevin McGavick,

8    United's (30(b)(6) Designee at 116:1-14) (Dkt. No. 214-1).) A United manager testified to the

9    same thing. (See Pritt Decl. Ex. 4 (Jeanette Dep. at 86:22-87:1) ("Do not call is an Avaya

10   disposition that has many meanings for different teams for different reasons.").) But this

11   testimony speaks broadly to all class members and whether the "do not call" disposition codes do

12   not mean what they say. If United succeeds in convincing a fact finder that its records are

13   unreliable it would do so on a class-wide basis without the need to examine individual calls.

14   Even if the Court were to hold individual trials for each class member, United has not identified

15   any unique evidence that would vary from class member to class member to show the code did

16   not mean what it says. The same is true for United's own call records because United has not put

17   forth any evidence to demonstrate how the call records would be utilized differently depending

18   on the class member.

19   Because Samson has shown that revocation of consent is subject to common evidence,

20   and United's arguments in rebuttal fail to demonstrate how individualized issues with

21   predominate, the Court finds Samson has shown predominance for the Do Not Call class.

22

23

24

1

       **c.**    **United's call exceptions arguments**

2

      United contends that emergency purposes calls, government-authorized calls, and other

3 healthcare message exceptions would require individual analysis that would defeat predominance

4 for both classes. (Opp. at 13.) This argument fails because United's records can be used to

5 identify these calls without needing individualized trials.

6

      The TCPA exempts calls made for emergency purposes. 47 U.S.C. § 227(b)(1)(A)-(B).

7 The Commission's rules define "emergency purposes" to mean "calls made necessary in any

8 situation affecting the health and safety of consumers." 47 C.F.R. § 64.1200(f)(4). The

9 "emergency purposes" exception is intended for "instances [that] pose significant risks to public

10 health and safety, and [where] the use of prerecorded message calls could speed the

11 dissemination of information regarding . . . potentially hazardous conditions to the public." <u>See</u>

12 1992 Order at 8778, para. 51. There are also healthcare-specific exemptions to the TCPA. One is

13 for "call[s] that deliver [] a "health care" message made by, or on behalf of, a 'covered entity' or

14 its 'business associate,' as those terms are defined in the HIPAA privacy rule, 45 CFR 160.103."

15 47 C.F.R. § 64.1200(a)(2). The second was introduced in the FCC's 2015 Order and applies to

16 most non-telemarketing healthcare calls, although the caller must satisfy a number of conditions.

17 <u>See</u> 2015 Order at 8031-32.

18

      In January 2023, the FCC issued a declaratory ruling that allowed government

19 contractors, among others, to make autodialed and prerecorded or artificial voice calls in certain

20 circumstances without violating the TCPA. <u>In Re Rules & Reguls. Implementing the Tel.</u>

21 <u>Consumer Prot. Act of 1991</u>, 2023 Declaratory Ruling. This was done largely so that individuals

22 enrolled in Medicaid under the COVID-19 pandemic eligibility requirements could complete the

23 renewals necessary to redetermine their eligibility in order to remain in the program post-

24

1    pandemic. (Id. at 2.) Calls made about renewing enrollment for state Medicaid programs,

2    Children's Health Insurance Program, Basic Health Program, or Health Insurance Marketplace,

3    are therefore permissible under the TCPA. (See generally, id.) However, the FCC makes clear in

4    its order that revocation of consent must still be honored, and calls made to telephone numbers

5    that have been reassigned are still subject to TCPA liability. (Id. at 7.)

6         United argues that because the emergency exception analysis turns on the "purpose" of

7    the call, it would require a call-by-call analysis of the content of each call to determine the

8    purpose. (Opp. at 13-14.) United's argument fails because the campaign code and call reason are

9    both documented in United's records. (See Murray Decl. Exs. 8, 16; Pritt Decl. Ex. 3 (Dkt. No.

10   193-3); Supplemental Declaration of Jennifer Rust Murray, Ex. 35 (McGavick Dep at 50:22-

11   51:21 (Dkt. No. 214-3).) This means that any campaigns exempt from liability can be removed

12   based on common evidence. This process was proven possible when United searched for calls to

13   Samson. (Murray Supp. Decl. Ex. 33 (Deposition Transcript of Jennie Jeanette at 21:1-22:10)

14   (Dkt. No. 229-1).)

15        Additionally, none of the mostly out of circuit case law United cites to here is applicable.

16   Of the cases, only four actually dealt with class certification, two dealt with a single phone call

17   that could easily be determined to be exempt for healthcare purposes and the other two did not

18   address predominance with regards to the exemptions. See Lindenbaum v. CVS Health Corp.,

19   2018 WL 501307 (N.D. Ohio Jan. 22, 2018) (finding that the single class of phone calls made

20   regarding prescription reminders were exempt under the emergency exemption); Zani v. Rite Aid

21   Headquarters Corp., 246 F.Supp.3d 835 (S.D.N.Y. 2017), aff'd, 725, F.App'x 41 (2d Cir. 2018)

22   (granting summary judgment over class certification because the case involved a single call

23   about getting the flu shot); Bridge v. Credit One Fin., 294 F.Supp.3d 1019, 1031 (D. Nev. Feb.

24

1  26, 2018) (denying class certification due to ascertainability issue); Pepka v. Kohl's Dep't

2  Stores, Inc., 2016 WL 8919460 (C.D. Cal. Dec. 21, 2016) (finding individualized issues of

3  consent would predominate). Because exempt campaigns can be excluded from the dataset using

4  common evidence, the Court finds this does not defeat predominance.

5              **d.    United's preemption defense under the McCarran-Ferguson Act**

6              United argues that many states have laws which preempt the TCPA, and the McCarran-

7  Ferguson Act ("MFA") would require state by state analysis. Because United has not

8  demonstrate that the law of any state preempts the TCPA, this argument fails.

9              The MFA provides: "No Act of Congress shall be construed to invalidate, impair, or

10  supersede any law enacted by any State for the purpose of regulating the business of insurance . .

11  . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012. Under this

12  section, state law preempts a federal statute if "(1) the federal law does not specifically relate to

13  insurance; (2) the purpose of the state enactment is to regulate the business of insurance; and (3)

14  the application of federal law to the case might invalidate, impair, or supersede the state law."

15  Ojo v. Farmers Group, Inc., 600 F.3d 1201, 1203 (9th Cir. 2010) (per curium) (en banc). As a

16  general rule, "[w]hen federal law is applied in aid or enhancement of state regulation, and does

17  not frustrate any declared state policy or disturb the State's administrative regime, the McCarran-

18  Ferguson Act does not bar the federal action." Humana Inc. v. Forsyth, 525 U.S. 299, 303

19  (1999). In order to prevail on this argument, United needs to demonstrate that all three elements

20  of the MFA are met, and that state law would preempt the application of the TCPA. It fails to do

21  this.

22              United cites to no support for its assertion that any state law preempts TCPA liability.

23  (See Opp. at 17.) United claims that twenty-eight states have different insurance-specific

24

1  exemptions to state laws governing telephone solicitation, which would require the Court to

2  interpret each state statute. (Id. at 18.) United then argues that there are also state laws that

3  immunize insurers for liability for calls on particular subjects. (Id. at 18.) For instance, United

4  cites to a Washington law that immunizes insurers from liability for any "communications, oral

5  or written, specifying the reasons for cancellation or refusal to renew or the providing of

6  information pertaining thereto." (Id.) Appendix B attached to United's brief contains a list of

7  thirteen states and their relevant statutes, the majority of which appear to provide an exemption

8  for liability when a call is made about insurance cancellation or a change in coverage.

9       It does not appear that the TCPA would invalidate or impair any of these laws - and

10  United does not argue that they do. The first category of laws are state laws on telephone

11  solicitation and presumably do not apply under the MFA because laws governing telephone

12  solicitation are not made for the purpose of regulating the business of insurance. Because United

13  fails to demonstrate otherwise it fails to satisfy the second element of the MFA. The second

14  category are laws that presumably regulate the business of insurance. But United still fails to

15  show how the application of the TCPA impairs, invalidates, or supersedes any of these laws.

16  Rather, most of the laws seem to provide exemptions for healthcare calls and emergency

17  purposes. As such, it would appear that the TCPA complements rather than impairs these laws.

18  Absent any analysis to show how even one of these laws is impeded by the TCPA, United's

19  argument fails.

20       United fails to demonstrate both the second and third elements of the test set forth under

21  the MFA. There is no indication a state-by-state analysis is required that would warrant a finding

22  against predominance. For these reasons, United's argument fails.

23

24

1  **F.      Rule 23(b)(3) – Superiority**

2  　　The second part of Fed. R. Civ. P. 23(b)(3) asks whether the class action is superior to

3  other available methods for fairly and efficiently adjudicating the controversy. Pertinent inquiries

4  include:

5

6  (A) the class members' interests in individually controlling the prosecution or defense of
    separate actions;

7  (B) the extent and nature of any litigation concerning the controversy already begun by or
    against class members;

8

9  (C) the desirability or undesirability of concentrating the litigation of the claims in the
    particular forum; and

10  (D) the likely difficulties in managing a class action.

11  Fed. R. Civ. P. 23(b)(3)

12  　　United makes no arguments against superiority and Samson properly demonstrates

13  evidence supporting Rule23(b)(3)(A)-(C). First, this case involves relatively small recoveries,

14  $500 for each violation, which makes it unlikely that the cases would be brought individually. 47

15  U.S.C. § 227(b)(3)(B). As the Ninth Circuit has explained, "[w]here damages suffered by each

16  putative class member are not large, this factor weighs in favor of certifying a class action."

17  Zinser v. Accufix Rsch. Ins., Inc., 253 F.3d 1180, 1190 (9th Cir.), opinion amended on denial of

18  reh'g, 273 F.3d 1266 (9th Cir. 2001). Second, while there are other cases currently pending

19  against United involving similar claims, these cases involve different classes and have been

20  indefinitely stayed, which is why the Court unstayed this case. (See Order Lifting Stay (Dkt. No.

21  171).) The Court finds the third factor does not strongly weigh one way or the other. As for the

22  final element, there is a "well-settled presumption that courts should not refuse to certify a class

23  merely on the basis of manageability concerns." Briseno v. ConAgra Foods, Inc., 844 F.3d 1121,

24

1  1128 (9th Cir. 2017). And there are no obvious difficulties in managing either class. The Court

2  finds Samson has demonstrated superiority.

3  **G.    United's Surreply**

4      United requests the Court strike three arguments that Samson makes in his Reply brief

5  asserting that they were all improperly made for the first time. (<u>See generally</u>, Surreply (Dkt. No.

6  234).) The Court disagrees with United's assertion.

7      United asks the Court to strike the following: (1) Samson's reliance on deposition

8  testimony to show that he received a pre-recorded call that demonstrates he has standing to bring

9  the claim; (2) Samson's expert's report that discusses how she would deal with inconsistent

10  disposition calls; and (3) Samson's arguments regarding common evidence for "Emergency"

11  calls and use of United's database to show call location. (Surreply at 2-4 (Dkt. No. 234).)

12      The Court DENIES the motion to strike as to all three categories. All of the arguments

13  and evidence United identifies as new are arguments and evidence that Samson submitted in

14  response to novel arguments United makes in its opposition. The Court also held oral arguments,

15  for which United submitted case law and exhibits for the Court to review, some of which

16  responded to Samson's arguments on these topics. For these reasons, the Court DENIES the

17  motion.

18  **H.    United's Supplemental Filing Concerning Oral Argument**

19      On October 11, 2023, United filed a Supplemental Filing Concerning Oral Argument.

20  (Dkt. No. 265.) United appears to be answering three questions the Court posed to it during oral

21  arguments. The Court reviewed the filing but ultimately did not consider it as it did not change

22  the outcome of the Court's analysis.

23

24

**CONCLUSION**

Samson has provided sufficient evidence to establish by a preponderance that class certification is appropriate and proper for his claims under the TCPA under Rule 23(a) and 23(b)(3). The Court certifies the following classes:

**<u>Wrong Number Class</u>**

"All persons residing within the United States who, between January 9, 2015, and January 9, 2019, received a non-emergency telephone call(s) placed using either the Avaya Pro Contact or LiveVox IVR dialing systems from the Medicare and Retirement Non-Licensed Retention Team, the Community and State National Retention Team or the Medicare and Retirement Collections Team, to a cellular phone through the use of an artificial or prerecorded voice, and who, according to Defendant's records, was not a UnitedHealthcare member at the time of the call."

**<u>Do Not Call Class</u>**

"All persons residing within the United States who, between January 9, 2015, and January 9, 2019, received a non-emergency telephone call(s) placed using either the Avaya Pro Contact or LiveVox IVR dialing systems from the Medicare and Retirement Non-Licensed Retention Team, the Community and State National Retention Team or the Medicare and Retirement Collections Team, to a cellular phone through the use of an artificial or prerecorded voice, and whose telephone number, according to Defendant's records, was flagged or documented as "do not call," "final do not contact" or otherwise recorded as a number not to be called."

The Court also appoints Beth Terrell, Jennifer Rust Murray, Adrienne McEntee or Terrell Marshall Group PLLC, David Searles, James Francis, John Soumilas, Jordan Sartell of Francis Mailman Soumilas PC, and Jonathon Shub of Shub & Johns LLC, as class counsel. The parties are directed to meet and confer regarding a plan for sending notice to the class and a form of notice. The parties shall meet and confer, and shall file the proposed notice with the Court no later than October 30, 2023.

The Court also DENIES United's request to strike.

//

//

The clerk is ordered to provide copies of this order to all counsel.

Dated October 13, 2023.

Marsha J. Pechman
United States Senior District Judge