THE HONORABLE MARSHA J. PECHMAN

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

8

9  FRANTZ SAMSON, a Washington resident, individually and on behalf of all others similarly situated,

10

Plaintiff,

11

12  v.

UNITED HEALTHCARE SERVICES, INC.,

13

14  Defendant.

No. 2:19-cv-00175-MJP

**DEFENDANT'S MOTION TO DECERTIFY THE CLASSES**

NOTE ON MOTION CALENDAR:
August 19, 2024

ORAL ARGUMENT REQUESTED

15
16
17
18
19
20
21
22
23
24
25
26
27
28

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

## MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ...........................................................................................................1

II.    BACKGROUND ............................................................................................................3

III.   LEGAL STANDARD.....................................................................................................5

IV.    ARGUMENT ..................................................................................................................6

    A.    Decertification is appropriate when subsequent discovery disproves the
bases on which classes were certified...................................................................6

    B.    New evidence shows that "do not call" and "wrong number" codes cannot
resolve the crucial question of consent on a class-wide basis ..............................8

        1.    Recordings of calls coded "do not call" disprove the theory on which
certification rests......................................................................................8

        2.    New evidence likewise shows that "wrong number" codes cannot
supply class-wide proof of a lack of consent ........................................14

            a.    Many calls coded "wrong number" do not reflect any
lack of consent .........................................................................14

            b.    Subsequent call recording evidence confirms that
"wrong number" codes cannot resolve the consent issue
on a class-wide basis ................................................................18

        3.    New evidence and recent developments have dramatically undermined
Plaintiff's reverse-lookup method..........................................................22

    C.    This new evidence warrants decertification.........................................................23

V.     CONCLUSION ..............................................................................................................26

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page ii

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Bais Yaakov of Spring Valley v. ACT, Inc.*,
    12 F.4th 81 (1st Cir. 2021) .................................................................................25

*Blair v. CBE Group, Inc.*,
    309 F.R.D. 621 (S.D. Cal. 2015) ....................................................................24, 25

*Bouissey v. Swift Transp. Co., Inc.*,
    2024 WL 649246 (C.D. Cal. Jan. 30, 2024) .........................................................7

*Carriuolo v. GM Co.*,
    823 F.3d 977 (11th Cir. 2016) ..............................................................................5

*Cole v. CRST, Inc.*,
    317 F.R.D. 141 (C.D. Cal. 2016) ..........................................................................5

*Gene & Gene LLC v. BioPay LLC*,
    541 F.3d 318 (5th Cir. 2008) ..............................................................................25

*Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*,
    29 F.4th 839 (7th Cir. 2022) ...............................................................................25

*Hendricks v. Aetna Life Ins. Co.*,
    344 F.R.D. 237 (C.D. Cal. 2023) ..........................................................................5

*Jin v. Shanghai Original, Inc.*,
    990 F.3d 251 (2d Cir. 2021) ..................................................................................6

*Johnson v. GEICO Cas. Co.*,
    672 F. App'x 150 (3d Cir. 2016) ...........................................................................8

*Johnson v. Yahoo! Inc.*,
    2018 WL 835339 (N.D. Ill. Feb. 13, 2018) ........................................................24

*Kelley v. Microsoft Corp.*,
    2009 WL 413509 (W.D. Wash. Feb. 18, 2009)..................................................6, 7

*Lara v. First Nat'l Ins. Co. of Am.*,
    25 F.4th 1134 (9th Cir. 2022) .............................................................................24

*Marlo v. UPS, Inc.*,
    639 F.3d 942 (9th Cir. 2011) .................................................................................6

*NEI Contracting & Eng'g, Inc. v. Hanson Aggregates, Inc.*,
    2016 WL 2610107 (S.D. Cal. May 6, 2016).........................................2, 5, 6, 7, 26

1

## <u>TABLE OF AUTHORITIES</u> (cont'd)

2

Page(s)

3

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,*
    31 F.4th 651 (9th Cir. 2022) ...................................................................9

4

5

*Phillips v. Sheriff,*
    828 F.3d 541 (7th Cir. 2016) ...................................................................8

6

*Rodriguez v. W. Publ'g Corp.,*
    563 F.3d 948 (9th Cir. 2009) ...................................................................5

7

8

*Sandusky Wellness Center, LLC v. ASD Specialty Healthcare, Inc.,*
    863 F.3d 460 (6th Cir. 2017) .................................................................25

9

*Selby v. LVNV Funding, LLC,*
    2016 WL 6677928 (S.D. Cal. June 22, 2016)............................25, 26

10

11

*Silver v. Pa. Higher Educ. Assistance Agency,*
    2020 WL 607054 (N.D. Cal. Feb. 7, 2020) ...........................................24

12

13

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011)...............................................................................12

14

*Whiteway v. FedEx Kinkos Office & Print Servs., Inc.,*
    2009 WL 9523749 (N.D. Cal. Oct. 2, 2009)............................................8

15

16

*Williams v. PillPack, LLC,*
    2021 WL 5113467 (W.D. Wash. Nov. 3, 2021) .................................2, 7

17

18

**Statutes**

19

47 U.S.C. § 227(b)(1)(A)...........................................................................3

20

**Rules**

21

Fed. R. Civ. P. 23 .........................................................................5, 6, 7, 24

22

Fed. R. Civ. P. 23(b)(3)........................................................................1, 25

23

**Treatises**

24

Newberg & Rubenstein on Class Actions (6th ed. June 2024 update) .......5, 6

25

26

27

28

DEFENDANT'S MOTION TO DISMISS CLAIMS OF
OUT-OF-STATE CLASS MEMBERS
No. 2:19-cv-00175 — Page iv

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

## I.    INTRODUCTION

The foundation on which Plaintiff obtained class certification has crumbled under the weight of new evidence.

As this Court previously recognized, the question whether each class member consented to be called by United is "crucial to the predominance inquiry" under Rule 23(b)(3).  Dkt. 266 at 17. At Plaintiff's urging, the Court concluded that United's call-disposition codes could resolve any disputes as to each class member's consent "on a class-wide basis without the need to examine individual calls." *Id.* at 23.  That conclusion rested on the proposition that if a call was coded "do not call" or "wrong number," the recipient must have either revoked consent or never consented to be called in the first place.

Since then, new evidence has rendered the bases for certification untenable.  The parties have conducted further discovery, in which United produced over 100,000 recordings of calls that were coded "do not call" or "wrong number" and later calls to and from phone numbers associated with those codes.  Reviewing even a fraction of those recordings reveals that the "do not call" and "wrong number" codes are incapable of addressing the critical consent issue across the class.

Take the "do not call" code.  Plaintiff contended that each use of that code necessarily meant the call recipient had asked never to be contacted again for any reason.  The call recordings tell a different story.  Some calls coded "do not call" involved members who affirmatively asked to be called back.  In others, members had productive conversations with United agents and made no mention of any request never to be called again.  And some were just unable to talk at that moment.  In example after example, calls marked "do not call" simply bear no indication of any revocation of consent.

Plaintiff must recognize the problem.  Shortly before this motion was filed, he submitted a proposed class list eliminating from his "do not call" class nearly 95% of people for whom call recordings were available.  Plaintiff's maneuver is not only an improper unilateral modification of the class definition it proposed and this Court adopted; it also effectively concedes that he can offer no common evidence to solve the question of revocation of consent on a class-wide basis. Without such common evidence, the do-not-call class cannot proceed.

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 1

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

New evidence likewise has eliminated the basis on which the "wrong number" class was certified. Plaintiff asserted that the "wrong number" code meant the recipient was not a member, and thus did not agree to be called by United. But the recordings show many calls coded "wrong number" to recipients who confirmed they were in fact United members, and who either invited future calls or said nothing about any lack of consent. Other recordings reflect calls to non-members—including caregivers, agents, and family members—who evidently agreed to be contacted about members' healthcare. In many cases, calls were marked "wrong number" when there was no indication *at all* about consent—for instance, when a call went right to voicemail. And recordings of later calls to and from phone numbers for which calls were coded "wrong number" further confirm that thousands of recipients of calls bearing that code are, in fact, United members or people who had agreed to be called on behalf of United members.

In granting certification, the Court reasoned that issues like this did not prevent certification of the wrong-number class because members could be identified and excluded using Plaintiff's reverse-lookup method, "cross-checked" against carrier subpoena data. Dkt. 266 at 17-18. But subsequent evidence has rendered that proposition untenable, too. Plaintiff himself has not relied on the reverse-lookup method to determine whether phone numbers belong to class members or people who agreed to be contacted on behalf of with class members. Moreover, the subpoena process returned names of account holders for only 50% of the wrong-number class, leaving half of the class (and thousands of individual class members) without any information that could be used as a "cross-check." The subpoena data itself also cannot resolve the question whether a particular phone number was owned by a class member. If anything, the data confirms that Plaintiff's reverse-lookup method is fundamentally unreliable because, where there is subpoena data, it frequently does not match the reverse-lookup results.

In all, the bases Plaintiff provided to justify class certification are no longer viable. And courts have recognized, both in the Telephone Consumer Protection Act context and beyond, that when evidence later undercuts the foundation of a class-certification order, the proper course is to decertify the classes. *E.g.*, *Williams v. PillPack, LLC*, 2021 WL 5113467, at *6-8 (W.D. Wash. Nov. 3, 2021); *NEI Contracting & Eng'g, Inc. v. Hanson Aggregates, Inc.*, 2016 WL 2610107, at

*7 (S.D. Cal. May 6, 2016), *aff'd*, 926 F.3d 528 (9th Cir. 2019).  The Court should do so here.

## II.    BACKGROUND

United administers health-benefit programs, including for "dual eligibility" members covered by both Medicare and Medicaid.  Dkt. 196 ¶¶ 2-6.  United runs call campaigns to reach those members about their healthcare.  The campaigns can involve anything from informing members about their plans to advising members of additional benefits to informing members when they're at risk of losing coverage.  Dkt. 196 ¶ 9; Dkt. 198 ¶¶ 5-6; Dkt. 200 ¶¶ 8-9.

When people enroll in a United plan, they give United their phone numbers, sometimes along with the numbers of family members and others who assist with their care, so they can be contacted.  Those numbers are entered into United's databases, and for some call campaigns, United uses dialing systems to place calls to the numbers the members provided.  Dkt. 266 at 2-3.  After each call, the United agent who made the call logs its "disposition," exercising judgment about how best to categorize each call based on a menu of preset options (two of which are "do not call" and "wrong number").  Dkt. 196 ¶¶ 10-12.

Plaintiff Frantz Samson got a new cellphone number in 2018.  Dkt. 266 at 2.  That number formerly belonged to two United dual-eligible members, who had given United their number to be called.  Dkt. 199 at 4.  The number was reassigned to Plaintiff, but no one told United, so he began receiving calls intended for the members.  Dkt. 266 at 2.  Plaintiff alleges the calls continued even after he told United that it had the wrong number and that he did not want to be called again.  *Id.*

Plaintiff sued United under the TCPA, which generally prohibits calls using prerecorded voices without the "prior express consent of the called party."  47 U.S.C. § 227(b)(1)(A).  He sought certification of two classes of people:  a "wrong number" class, comprising people who were not United members but who received prerecorded, "non-emergency" calls; and a "do not call" class, comprising those who received prerecorded, "non-emergency" calls but whose phone numbers were coded in United's records as not to be called.  Dkt. 266 at 3.

The Court certified both classes in October 2023.  Dkt. 266.  It recognized that "consent [is] central to TCPA claims" and that the appropriateness of certifying a TCPA class often depends on whether the plaintiff can produce evidence to resolve, on a class-wide basis, "any disputes as

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 3

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

to each class member's consent to be called." *Id.* at 4. The Court concluded, based on the record then before it, that United's "do not call" and "wrong number" codes were "sufficient to show lack of consent" across the class. *Id.* at 11-12. Under that reasoning, every "do not call" code meant the recipient had asked never to be contacted by United again for any purpose, and every "wrong number" code meant the recipient was a non-member who had not agreed to be called by United.

In ruling on certification, the Court recognized that United had presented evidence—mainly in the form of testimony from United supervisors—that the "do not call" and "wrong number" codes do not uniformly mean what Plaintiff asserted they mean. Dkt. 266 at 22-23. But the Court concluded that evidence constituted only "broad strokes" statements that did not illustrate "how any individualized issues would predominate." *Id.* at 23. Because the record did not illustrate how there could be "unique evidence that would vary from class member to class member to show the code did not mean what it says," the Court concluded the factfinder would be able to make an across-the-board judgment about the disposition codes "without the need to examine individual calls." *Id.* And with respect to the "wrong number" class, which is defined to exclude United members, the Court concluded that Plaintiff's reverse-lookup method and carrier subpoena data could be used to reliably screen out calls associated with members. *Id.* at 17-18.

Since certification, the parties have engaged in additional discovery. Between February and July 2024, United produced all relevant call recordings it could locate, amounting to over 115,000 audio recordings, including over 16,000 recordings of calls coded "do not call" or "wrong number" and over 98,000 recordings of later calls to and from phone numbers for which previous call records bear those codes. Mugler Decl. ¶ 3. For this motion, United reviewed samples from the first 1,000 recordings in each of four categories: (i) calls coded "do not call," (ii) calls coded "wrong number," (iii) later calls to numbers following an initial "wrong number" code, and (iv) incoming calls from numbers following an initial "wrong number" code. *Id.* ¶ 8. The examples from that review cited here were then transcribed for convenience. *Id.* ¶ 9.

Simultaneously, Plaintiff subpoenaed information from four telephone carriers to identify the users of phone numbers in the class. Kwon Decl. ¶ 8. The subpoena process yielded account-holder information for about 50% of the wrong-number class and about 65% of the do-not-call

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 4

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

class. *Id.* ¶ 20.  To date, Plaintiff has not completed the "reverse lookup" method, and did not rely on the method to determine who should be included or excluded from his class list.  *See* Mugler Decl. ¶ 6; *id.* Ex. 359.  For purposes of this motion, United's expert followed the steps of the reverse-lookup method previously outlined by Plaintiff's expert so that the results could be compared to data received from subpoenas of phone carriers.  Kwon Decl. ¶ 6.

Shortly before this motion was filed, Plaintiff submitted a proposed class list.  Mugler Decl. ¶ 4.  He previously represented that there were over 72,000 members in the classes.  Dkt. 272, at 5.  But Plaintiff's recent list contains just over 25,000 members—about a two-thirds decrease.  Mugler Decl. ¶¶ 4-5.  About 32,500 members were excluded because the parties now agree their phone numbers did not receive any prerecorded message.  *Id.* ¶ 5.  But Plaintiff's list also excludes nearly 95% of members for which "do not call" recordings were available, over 50% of members for which "wrong number" recordings were available, and over 85% of members for which United produced recordings of calls to and from phone numbers with earlier "wrong number" calls.  *Id.* Plaintiff did not explain the criteria he used or how the exclusions were consistent with the classes as they were defined and certified.  *See id.* Ex. 359.

## III.    LEGAL STANDARD

District courts have "a continuing duty to ensure compliance with class action requirements pursuant to Rule 23," *Cole v. CRST, Inc.*, 317 F.R.D. 141, 144 (C.D. Cal. 2016), and so "may decertify a class at any time," *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009).  This duty is "'critical'" because, as a case progresses, the appropriateness of certification "'may change radically as . . . more information is gathered.'"  *Carriuolo v. GM Co.*, 823 F.3d 977, 988 (11th Cir. 2016).  Decertification is appropriate, for instance, "when full merits discovery reveals new information about the class claims," including evidence showing that Rule 23's rigorous requirements are not satisfied.  3 Newberg & Rubenstein on Class Actions § 7:38 (6th ed. June 2024 update); *see, e.g.*, *NEI Contracting & Eng'g, Inc. v. Hanson Aggregates, Inc.*, 2016 WL 2610107, at *7 (S.D. Cal. May 6, 2016).

"'A party seeking class certification bears the burden of demonstrating compliance with class certification requirements even on a motion to decertify a class.'"  *Hendricks v. Aetna Life*

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 5

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

*Ins. Co.*, 344 F.R.D. 237, 241 (C.D. Cal. 2023); *see Marlo v. UPS, Inc.*, 639 F.3d 942, 947 (9th Cir. 2011).  District courts have "broad discretion" to decertify, and parties seeking decertification based on new evidence "need not satisfy a heightened standard of review."  Newberg & Rubenstein, *supra*, § 7:34; *accord NEI Contracting*, 2016 WL 2610107, at *5.  As one court put it, "the metric by which a district court may properly decertify is not whether . . . an 'intervening event' crosses a threshold of 'significance,' " but only "that a previously satisfied requirement of Rule 23 is now lacking."  *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 262 (2d Cir. 2021).

## IV.    ARGUMENT

Subsequent discovery has undermined Plaintiff's model of class adjudication.  Plaintiff's theory, as reflected in the classes the Court certified, was that "do not call" and "wrong number" codes would be able to resolve the critical question of consent to be called on a class-wide basis.  But hundreds of call recordings—drawn from just a fraction of all available recordings produced in discovery—contradict that submission and reveal that the codes cannot resolve the issue of consent across the class.  Plaintiff's choice to jettison *thousands* of people whose calls were recorded only proves the point.  Subsequent discovery also has revealed that neither carrier subpoena data nor the reverse-lookup method can solve the problem of figuring out whether particular calls were to or from United members or people who had agreed to be contacted on behalf of United members.  All this means that the Court, in conducting a class trial, would have to oversee individualized proceedings to resolve the consent issue person by person and call by call.  Rule 23 does not permit those types of individualized proceedings, so the Court should follow the example of others around the country and decertify the classes.

**A.    Decertification is appropriate when subsequent discovery disproves the bases on which classes were certified.**

The "power to revisit certification" after a defect in a plaintiff's class-adjudication model becomes clear is a " 'vital ingredient' " in a court's management of any class action.  *Kelley v. Microsoft Corp.*, 2009 WL 413509, at *2-3 (W.D. Wash. Feb. 18, 2009).  It ensures courts can revisit certification when discovery reveals that individualized issues "would entail factual

1  mini trials for each class member resulting in an unmanageable range of factual and legal issues."

2  *Bouissey v. Swift Transp. Co., Inc.*, 2024 WL 649246, at *8 (C.D. Cal. Jan. 30, 2024).

3        In *Williams v. PillPack LLC*, 2021 WL 5113467 (W.D. Wash. Nov. 3, 2021), for instance,

4  Judge Bryan decertified a TCPA class after evidence uncovered by further discovery revealed that

5  the plaintiffs could not satisfy Rule 23.  Although call records had initially led the court to rule

6  that consent could be determined on a class-wide basis, *id.* at *2, discovery later revealed "that

7  some of the class members . . . consented to be called," *id.* at *6.  Based on that evidence, the court

8  concluded that "individualized issues of consent [would] predominate," so it decertified the class.

9  *Id.* at *6-8.

10        Likewise, in *Bouissey*, the court certified a class of truck drivers on the theory that codes

11  in data logs could provide class-wide proof of whether individual drivers were carrying loads under

12  certain conditions.  2024 WL 649246, at *1.  But discovery later revealed the log codes could not

13  serve as class-wide proof "because the entries [we]re dependent upon individual drivers' recording

14  practices," and the meaning of the codes thus "var[ied] across the entries."  *Id.* at *6-7.  The court

15  determined that the variability of what the codes reflected "would necessitate individualized

16  inquiries to determine whether a driver had a load" and require "scrutiny into the individualized

17  circumstances of each driver's entry" in a manner inconsistent with Rule 23.  *Id.* at *7-8.

18        And in *NEI Contracting*, 2016 WL 2610107, the district court also decertified a class

19  "based on evidence not before the [c]ourt" at class certification.  *Id.* at *1.  At issue was a California

20  law prohibiting the recording of calls without consent.  *Id.*  The court initially certified a class of

21  people whose calls were recorded, but the defendant later presented "nine examples of customers

22  who had actual knowledge of [the defendant's] recording practice," including recordings showing

23  the recipients knew the call was being recorded.  *Id.* at *3, *7.  Those examples "demonstrate[d]

24  that individualized inquiries w[ould] be necessary to determine whether [the defendant] recorded

25  calls 'without the consent of all parties.'"  *Id.* at *7.  The court thus decertified the class.  *Id.* at *8.

26        This Court, too, has recognized that when later discovery reveals that the plaintiffs cannot

27  offer a "viable . . . class-wide" method resolving each class member's claim, "class treatment [is]

28  no longer appropriate," and decertification is warranted.  *Kelley*, 2009 WL 413509, at *6, *9.

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 7

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

Many other courts across the country have recognized the same. *See, e.g.*, *Johnson v. GEICO Cas. Co.*, 672 F. App'x 150, 157 (3d Cir. 2016); *Phillips v. Sheriff*, 828 F.3d 541, 558-60 (7th Cir. 2016); *Whiteway v. FedEx Kinkos Office & Print Servs., Inc.*, 2009 WL 9523749, at *3 (N.D. Cal. Oct. 2, 2009).

## B.    New evidence shows that "do not call" and "wrong number" codes cannot resolve the crucial question of consent on a class-wide basis.

Based on the "broad strokes" evidence then before it, the Court certified two classes on the ground that "common evidence from United's records can resolve any disputes as to each class member's consent to be called" because the logs "show a lack of consent when there is either a 'wrong number' or 'do not call' disposition." Dkt. 266 at 4, 19-23. Things have since changed. Over 100,000 call recordings have been produced. And even a small sampling of those recordings belies the notion that "do not call" and "wrong number" codes can resolve the consent issue. Moreover, the reverse-lookup method and carrier subpoena data the Court concluded would make the "wrong number" class manageable by clearly identifying members, *id.* at 17-18, have proven incapable of performing that task. Without these class-wide sources of proof, the Court is left only with thousands of individualized claims.

### 1.    Recordings of calls coded "do not call" disprove the theory on which certification rests.

Plaintiff's recent proposed class list excludes *thousands* of phone numbers that meet the definition of the do-not-call class this Court certified. Mugler Decl. ¶ 5. Why would a named plaintiff suddenly jettison so many people covered by a certified class definition? The answer is simple: Plaintiff, after sampling the recordings as United did, observed that the "do not call" code often did not mean that consent had been revoked. So Plaintiff dumped nearly 95% of the thousands of phone numbers for which a "do not call" recording was available. *Id.*

To begin, that en-masse ejection of people is improper. A party that secures certification of a class defined one way cannot rely on unarticulated and unapproved distinctions to exclude people who could not recover or who would reveal class certification to be untenable. That approach would unilaterally amend the Court's certification order—the do-not-call class, after all,

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 8

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000

is defined exclusively based on how calls were coded in United's records (*see* Dkt. 216 at 30), so Plaintiff cannot eliminate thousands of phone numbers from "do not call" calls simply because the evidence has shown those call recipients never revoked consent and thus could not be entitled to recover under any theory. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 n.14 (9th Cir. 2022) (en banc).

Plaintiff's maneuver is also telling. By dropping so many people from the class, Plaintiff concedes that the "do not call" code cannot supply the class-wide evidence his theory requires. That concession alone merits the Court's revisiting its certification order. And even for phone numbers for which there are no recorded calls available and those few recorded calls Plaintiff was content to leave in his class list, the extensive recording evidence United has produced would still provide overwhelming evidence that the "do not call" code cannot eliminate the need for individualized factfinding to resolve the consent issue.

Given what the call recordings show, it's unsurprising Plaintiff has excluded virtually all phone numbers for which recordings of "do not call" calls were available. Consider one call to a United member who was recovering from surgery. Mugler Decl. Ex. 63, at 2. The member asked to "reschedule" the call, *id.*, and the caller agreed:

```
            CALLER:  That's no problem.  That's no
problem.  Okay.  You definitely take care of yourself,
though.  Okay?
            RECIPIENT:  Okay.  You'll give me a call
back?
            CALLER:  And when you -- yeah --
            RECIPIENT:  Okay, thanks sweetie.
            CALLER:  You are welcome.
            RECIPIENT:  I appreciate that.
```

*Id.* at 3. Although the "do not call" code was selected, the recording shows that, far from *refusing* future calls, the recipient *solicited* more calls. Examples like this could hardly be more inconsistent with Plaintiff's theory of certification.

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 9

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

One recurring circumstance was the agent's selection of "do not call" to mark that the specific purpose for the call had been accomplished. For example:

- An agent advised that the United member's low-income subsidy had lapsed and explained how the member could reapply. Mugler Decl. Ex. 80, at 3-6. The member promised to look into reapplying, and the call ended without any suggestion that United should not call again. *Id.* at 7.

- An agent called to advise the member that he had a pending balance on his account but was in no danger of losing coverage. Mugler Decl. Ex. 67, at 2-3. The recipient responded that he "appreciate[d] it" and "thank[ed] [the agent] for calling," again without any suggestion that he did not want to be called again. *Id.* at 4-6.

- An agent called a member to discuss a billing issue. Mugler Decl. Ex. 8, at 2-7. The member discussed how to resolve that issue and handed the phone to his wife, herself a United member, to assist with a replacement ID card. *Id.* at 9-10. The members expressed "thank[s]" for the agent's help, *id.* at 13, and never suggested any revocation of consent.

Many similar examples emerged from United's limited review. An agent talked a member through questions about a physical-fitness program. Mugler Decl. Ex. 9, at 2-5; *accord id.* Ex. 303. An agent called to check on a member's mental health following the death of her spouse (which the member "appreciate[d]"). *Id.* Ex. 79, at 4-5. An agent checked in with a member living in an area affected by a hurricane. *Id.* Ex. 66. An agent called to check in on the member's health plan (and learned "everything is great"). *Id.* Ex. 39, at 2. An agent reached the wife of a member, an "authorized representative on his account," to discuss a pending balance. *Id.* Ex. 89. An agent reassured a member that a letter suggesting a coverage rider had been terminated was sent in error. *Id.* Ex. 72. An agent walked a member through how to set up automatic billing. *Id.* Ex. 18, at 2-6; *accord id.* Ex. 20 (similar). An agent talked to a member about a partial payment and reassured the member about ongoing emergency room coverage. *Id.* Ex. 86, at 2-5. An agent advised a member of a balance requiring payment. *Id.* Ex. 19, at 2-3; *accord id.* Exs. 22, 27, 33, 51,58, 59, 61, 64, 74, 75, 88, 95. An agent resolved a payment-processing issue. *Id.* Ex. 31; *accord id.*

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 10

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000

Exs. 30, 32, 41, 49, 53, 68, 73, 78, 96.  And on and on.  *See, e.g.*, *id.* Exs. 24, 25, 29, 36, 45, 46, 48, 52, 84 (more "do not call" calls with no mention of withdrawal of consent).  None of these calls ends with the member's revoking consent to be called again.  Often, they instead feature comments like "Thank you so much for your help," *id.* Ex. 20, at 6; *accord id.* Ex. 18, at 9, and "God bless you," *id.* Ex. 86, at 5.  Here's how one call, in which the caller reached the member and resolved a payment issue, ended:

```
     CALLER:  So it simply was a past due balance.  So if you
plan on going and paying it online, I'll certainly note your
account of that.  I do show it's currently at $45.
     RECIPIENT:  Okay.  Yeah, I'll take care of that today.
     CALLER:  Okay.  Sounds good.  That's all I --
     RECIPIENT:  I just wanted to make sure that that went
through.  And I'm glad that you called me.  I don't have to
go online and go through the whole process of verifying it,
so thank you.  I'll get that taken care of today.
```

*Id.* Ex. 90, at 3.

Another category of calls that contradict Plaintiff's theory are ones that, though unsuccessful in terms of the caller's objective, do not feature any revocation of consent by the member.  In one instance, a caller reached the member, who "kn[ew] [United] need[ed] to talk to [her]" but who was "heading into a meeting."  Mugler Decl. Ex. 50, at 2-3.  In another, after the caller informed the member of an account balance, the member simply responded, "I'm not going to pay it," and hung up.  *Id.* Ex. 12, at 4.  Another caller reached the United member, but the call dropped after the member drove into a parking garage.  *Id.* Ex. 47, at 2.  Another agent failed to reach the member, who was "not [t]here" at the moment.  *Id.* Ex. 26, at 2; *accord id.* Exs. 65, 81.  And many calls were marked "do not call" simply because they went straight to an automated message.  *Id.* Exs. 11, 13, 14, 16, 17, 21, 23, 56, 57, 77, 91.  Examples like these are also wholly incompatible with the notion that the "do not call" code supplies class-wide evidence that the call recipients affirmatively revoked consent to be called.

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 11

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

Just as relevant for class certification, there are also many examples in which the recordings at best leave room for doubt about whether the recipient gave or revoked consent, confirming that the consent issue is insusceptible to resolution "in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Take one of the (rare) examples of recorded "do not call" calls that Plaintiff did not exclude from his class list, in which the member learned the caller was offering additional benefits under a "prescription drug plan" and responded, "I don't want to talk to you." Mugler Decl. Ex. 43, at 2. By leaving that call in, Plaintiff evidently thinks the member's comment reflects a revocation of consent. United disagrees; a member's unwillingness to hear about a specific benefit does not mean he never wants to be contacted about his healthcare at all. Deciding which party has the right view of that member's consent would be a task for the factfinder, who would have to analyze evidence unique to the call.

Other recordings illustrate similar issues involving the existence and scope of consent to be called:

- An agent called a member about missed payments, and the member expressed displeasure that he had received several United calls while "on a temp assignment at a front desk." Mugler Decl. Ex. 92, at 3-4. The member assured the agent he would make the missing payments the following week, and the agent indicated he would "note that on the account . . . so we don't contact you again *about this*." *Id.* (emphasis added).

- One member declined to talk to the caller, but only when asked if she "ha[d] a moment to speak about [her] account with [United] [*that*] *day*." Mugler Decl. Ex. 37, at 2 (emphasis added).

- The wife of a member, who "handle[s] his affairs," indicated the couple was "not . . . interested in" making an overdue payment and was planning to disenroll from their plan but not had not yet done so. Mugler Decl. Ex. 35, at 2-4.

- One member indicated he had no "time right now" to discuss his policy because his wife has recently passed away. Mugler Decl. Ex. 82, at 2.

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 12

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

- Another member agreed to make an overdue payment but complained, at the start of the call, that United was "calling . . . way too much."  Mugler Decl. Ex. 34, at 2.

- And in many instances, call recipients simply refused to give identifying information over the phone without saying anything about consent to be called.  Mugler Decl. Exs. 28, 38, 40, 42, 44, 60, 69, , 76, 85, 93, 351; *see also id.* Ex. 87 (recipient objects to recording of call).

In such cases, the parties may well have different views about how to interpret statements by the recipient.  The only way to resolve such disagreements would be for the factfinder to take evidence relating to each call and to determine both the scope of each recipient's consent and whether later calls to the person fit within that scope.

Other recordings provide even less indication about the recipient's consent to be called. Sometimes, the issue is an early hang-up that doesn't reveal much of anything.  *E.g.*, Mugler Decl. Exs. 10, 83.  Other times, the member may indicate that another person "takes care of all this stuff for [him]" but decline to provide the agent with a way to reach that person.  *Id.* Ex. 55, at 2-3; *see id.* Ex. 94 (member indicates he has a "care keeper" but refuses to "identify himself" to set up authorized representative).  Sometimes, there's a defect on the line preventing the agent and recipient from speaking.  *Id.* Ex. 70.  And in other instances, a language barrier may prevent the caller and recipient from communicating clearly.  *E.g.*, *id.* Ex. 62.

These examples represent the tip of the iceberg.  They were drawn from a sampling of 1,000 recordings, representing only about 13% of the "do not call" calls for which recordings were available and under 5% of *all* "do not call" calls.  Mugler Decl. ¶ 8.  The need to pore over evidence relating to each of these calls, including the recordings and any further evidence needed to resolve disputes about consent, would quickly overrun any class trial.

Plaintiff no doubt hoped to avoid this problem by excluding from his class list virtually every "do not call" call for which a recording was available.  Mugler Decl. ¶ 5.  But that ostrich-like approach doesn't make the recordings irrelevant.  The recordings are important not just because of what they show about particular calls, but also because they reveal that the sole class-wide method of proof Plaintiff has offered does not work in the way he insists.  The question

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 13

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

relevant to each class member's claim is whether the class member *in fact* revoked consent to be called again by United for any purpose. We know from the recordings that "do not call" codes cannot answer that question, and certainly cannot answer it uniformly in every case. So even for phone numbers for which there are no available recordings, adjudicating this case as a class action would still necessitate individualized mini-trials, on a call-by-call basis, to resolve the issue of consent. Otherwise, the case would be proceeding based on a premise that—as even Plaintiff appears to agree—has been proven faulty.

### 2.    New evidence likewise shows that "wrong number" codes cannot supply class-wide proof of a lack of consent.

In seeking certification of the wrong-number class, Plaintiff relied on a similar shortcut—namely, that when a call is coded "wrong number," it means the recipient was not a United member and thus had not consented to be called by United. Based on the evidence at the time, the Court accepted that view, reasoning that any United members could be reliably identified and screened from the class using Plaintiff's reverse-lookup method, cross-checked with carrier subpoena data. Dkt. 266, at 17-19.

Both aspects underlying the certification of the wrong-number class have been undermined by subsequent evidence. United has produced nearly 9,000 recordings of calls coded "wrong number" and over 98,000 recordings of calls to and from phone numbers for which an earlier call was coded "wrong number." Mugler Decl. ¶ 3. These recordings belie the notion that "wrong number" can resolve the issue of consent on a class-wide basis—a point Plaintiff again proves by jettisoning from his class list huge numbers of people whose calls were recorded. *Id.* ¶ 5. Moreover, the carrier subpoena data that the Court believed would validate Plaintiff's reverse-lookup method actually undercuts it. Kwon Decl. ¶¶ 6, 22-33. In both respects, the bottom has fallen out from under the wrong-number class.

### a.    Many calls coded "wrong number" do not reflect any lack of consent.

The new evidence reveals countless examples in which agents used the "wrong number" code in circumstances that do not reflect that United lacked consent to call.

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 14

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

Take a typical example:  an agent called to speak to a United member, and the recipient responded, "She's not here.  Can I take a message?"  Mugler Decl. Ex. 106, at 2.  But after the agent described the purpose of the call, the recipient revealed that *she* was in fact the member, and

```
        CALLER:  Do you give permission for the agent to
give you a call?
        RECIPIENT:  Yeah.
```

had said she wasn't there only because she doesn't "like to answer the phone." *Id.*  The member then agreed to talk through coverage options, and even reaffirmed her consent to future calls: *Id.* at 2-3, 6.

Many other examples of calls coded "wrong number" similarly reflect successful outreach to members who had agreed to be called.  One agent talked a United member through an upcoming Medicaid review and renewal options.  Mugler Decl. Ex. 147, at 2-4.  Another agent informed a member about potential Medicare plans offering "additional benefits" and, although the member was "not looking for a change right [then]," she "thank[ed] [the agent] for calling." *Id.* Ex. 133, at 2-3.  Still other agents reached United members, informed them of the possibility of additional benefits, and learned the members were not interested. *Id.* Ex. 151, at 2.  These calls simply cannot be interpreted as reflecting a lack of consent to be called.

Just as with "do not call," many "wrong number" recordings at best create a factual dispute about whether and how the call recipient had agreed to be contacted.  In one instance, the member could not speak because he was "at [his] work" at the time, so he asked the agent to "call [his] wife" at a different number.  Mugler Decl. Ex. 124, at 2.  In another, the agent reached the member, who explained that the number dialed was a "very old phone" that the member "do[esn't] usually answer." *Id.* Ex. 150, at 2.  And another member told the agent that she preferred to "deal with [her] case manager" rather than the agent. *Id.* Ex. 159, at 2.

Moreover, many recordings reveal that "wrong number" was used for calls to non-members who had nonetheless consented to be called.  In one instance, the recipient advised the agent that he "take[s] care of everything," including insurance, for the United member.  Mugler Decl.

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 15

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

Ex. 149, at 2. Although the recipient was highly knowledgeable about the member's insurance coverage, he was "not in a position to talk" at that moment, but did not object to being called back:

```
              RECIPIENT:  But I'm really not in a position to
talk about this right now.  I'm in the middle of some stuff
at work.
              CALLER:  Sure.  Yeah.
              RECIPIENT:  Okay?
              CALLER:  Yeah.  We'll call you another time.
              RECIPIENT:  Okay.  Thank you much.
```

*Id.* at 3. Examples like this are common: many calls marked "wrong number" involved an agent who reached a member's parent, guardian, or authorized representative, who evidently had agreed to be contacted about the member's healthcare. *E.g.*, *id.* Exs. 135, 150, 155, 161.

In other instances, the recordings illustrate the sorts of ambiguous circumstances that would require individualized assessments to resolve. For instance:

- An agent called to speak to a member, and the member's brother answered, telling the agent that the member "*used* to use [his] phone." Mugler Decl. Ex. 138, at 2 (emphasis added). The agent explained the purpose of the call, and the brother responded, "I'll tell him that you called . . . because, you know, we share the same number." *Id.* Those are contradictory statements about whether the number was still in use by the member, and nothing in the call logs or recording would allow a factfinder to resolve the conflict.

- The call recipient, when asked about the member's availability, explained: "this is a religious community," and the member is "one of our sisters." Mugler Decl. Ex. 165, at 2. Before the recipient could continue, the agent interrupted, indicating the call would be coded as being an "incorrect number." *Id.* The agent never clarified whether the member had asked to be reached at that number.

- The call recipient explained the member was "a patient at our facility" and asked if the agent "want[ed] to speak to the nurse." Mugler Decl. Ex. 160, at 2. The agent confirmed that the member did not handle her own healthcare benefits, *id.*, but did not

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 16

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

ask or confirm whether a nurse or other employee at the facility had been authorized to do so.

- The agent reached the cousin of the member, who explained that the member had given his contact information as a "secondary number" and that he "used to handle all this for her."  Mugler Decl. Ex. 132, at 2-4.  The recipient did not specify whether he initially gave consent to United to be called when he was handling the member's affairs and if he withdrew such consent at any point.

- The agent reached the member's fiancée, who accepted the call and indicated she would pass on the message to the member.  Mugler Decl. Ex. 167, at 2.  The agent and recipient did not address whether she previously consented to receive such calls relating to her fiancé's healthcare.

Countless recordings reveal the sorts of individualized factfinding that will be required. The mother of a United member says she is "not going to be around for *a while*," Mugler Decl. Ex. 157, at 2 (emphasis added)—wrong number, or a request to call back later?  *See also id.* Ex. 104, at 2 (member "is in a correctional facility" for unspecified period).  The recipient of a call explains that the member is "hard to get ahold of" because he "kind of . . . runs around," *id.* Ex. 131, at 2-3—wrong number, or just a member who's frequently on the move?  The agent calls for the parents of a minor member but is told "[t]hey're not around," and the recipient offers to take a message—correct phone number, or a wrong number belonging to an obliging non-member? *Id.* Ex. 164.  The agent reaches the husband of a member, who says she is "at home" and can be reached at a more "direct" number—did the husband consent to be call, and did the member sometimes use his phone?  The recipient of another call immediately hangs up after the caller explains he is with United and trying to reach the member, *id.* Ex. 101, at 2—wrong number, or someone who wasn't able or willing to speak just then?  *See also id.* Exs. 126, 128, 130, 144 (similar).  And what about the *many* calls coded "wrong number" simply because they went directly to an automated message? *E.g.*, *id.* Exs. 100, 102, 103, 105, 125, 127, 129, 134, 137, 139, 140, 141, 146, 148, 152, 153, 154, 156, 158, 162, 163, 166, 168, 352; *see also id.* Exs. 136, 142, 143, 145 (indecipherable responses).

The disposition codes cannot answer questions like these in one stroke.  To arrive at an answer for each of the thousands of calls in the class, the factfinder would have to consider testimony from individual call recipients and agents.

### b. Subsequent call recording evidence confirms that "wrong number" codes cannot resolve the consent issue on a class-wide basis.

Other call-recording evidence not before the Court at certification confirms that "wrong number" codes cannot provide class-wide proof of a lack of consent.  There is a straightforward way to test Plaintiff's theory:  if he were right that "wrong number" meant the recipient was a non-member who had never agreed to be called, then any later calls by United to the number would reflect as much, and there would be no reason for calls from that number to United afterward.  But recordings of calls to and from those numbers after an initial "wrong number" code, nearly 100,000 of which United has located and produced (Mugler Decl. ¶ 3), contradict both of those premises.  And once again, Plaintiff evidently agrees, having excluded over 85% of the approximately 20,000 phone numbers for which there were available recordings of these kinds of subsequent calls.  *Id.* ¶ 5.

**i. Later calls to "wrong" numbers.**  In many cases, when agents again called numbers formerly coded as "wrong number," the recipients affirmatively identified themselves as members—and many even *asked* to be called again.  One member, for instance, requested a call back because he was "in a meeting."  Mugler Decl. Ex. 114, at 2; *accord id.* Ex. 265, at 2 (member was "eating" and invited "call back in a few minutes"); *id.* Ex. 257 (member requested callback because he was caring for children).  Another member identified herself but was "out in the street"

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 18

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

and likewise requested "a call back." *Id.* Ex. 254, at 3.  Here's a typical call in this vein:

> CALLER:  I'm doing well, thank you.  I'm calling to welcome you to the Dual Complete Plan and to go over your benefits with you.
>
> RECIPIENT:  Okay.  Well, I'm actually on my way to the hospital.  Is there another way we could do it?
>
> CALLER:  Oh, yeah, we can call you another time.  No problem.
>
> RECIPIENT:  All right.  I appreciate it.  Thank you for the welcome, though.

*Id.* Ex. 235, at 2.  Here's another:

> RECIPIENT:  This is him, but this is not a good time.
>
> CALLER:  Okay.  We can call back another time, okay?
>
> RECIPIENT:  Okay.  Thank you.

*Id.* Ex. 236, at 2.  And another, involving a call to a member who was sick at the time:

> CALLER:  Oh, my.  Well, feel better.  We'll have an agent contact you at a later date, okay?
>
> RECIPIENT:  Okay.  Thank you.
>
> CALLER:  Yeah, absolutely.  Feel better.

*Id.* Ex. 226, at 2-3.  Examples of call recipients who requested future calls from United like this are many, *e.g., id.* Exs. 244, 242, 230, 353, 192, 185, 178, 233, 15, 190, 2, 4, 169, 5, 173, and cannot be squared with the view that the call recipients were non-members who hadn't consented to be called.

Similarly abundant are examples of calls confirming the number was anything but wrong.  Here's one, after the agent asked if the member was there:

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 19

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

```
RECIPIENT:  Not here.

CALLER:  Is this the correct number, though?

RECIPIENT:  Yes.

CALLER:  Okay.  All right.  We'll try calling back later
on.  Thank you very much.
```

Mugler Decl. Ex. 203, at 2; *accord id.* Ex. 110.  In another, the call recipient told the agent the member was merely "out of town at the moment."  *Id.* Ex. 205, at 2.  Over and over, people who received calls when members were unavailable welcomed the agents to call back another time, indicating the intended recipient still used the number.  *Id.* Exs. 267, 211, 213, 212, 217, 177, 187, 201, 354, 258, 216.  And often, the person who answered the phone would tell the agent not that the intended recipient was unknown or did not use the number, but simply was "not [t]here *right now.*"  *Id.* Ex. 170, at 2 (emphasis added); *accord id.* Exs. 200, 208, 225, 253, 180, 176, 188, 251, 247, 218, 234, 260, 266, 355, 187, 196; *see also id.* Exs. 122, 259 (intended recipient was sleeping).

For other calls, members *did* have time to talk, and they discussed their plans and various coverage and benefit options with the agent.  Many calls in this group were detailed discussions to welcome a member to a plan and to outline the benefits it offered.  Mugler Decl. Exs. 121, 98, 204, 224, 255, 228, 245, 221, 183, 215, 264, 107, 111, 238, 7, 6, 250, 172, 246.  Other calls reached members to discuss new or additional benefits, often at no additional.  *Id.* Exs. 214, 120, 123, 109, 116, 186, 206, 175, 191, 174, 99, 262, 263, 237, 182, 250, 356, 209, 118, 220, 113, 119, 97, 3, 241, 249, 117, 227, 248, 237.  Other calls involved reminders to renew Medicaid, *id.* Ex. 223, check in on coverage, *id.* Exs. 189, 232, perform a health-risk assessment, *id.* Exs. 108, 256, 194, 193, "make sure that [the member] do[esn't] lose th[e] coverage," *id.* Ex. 199, at 4, or invite members to a local community event, *id.* Exs. 181, 195, 231, 219, 222, 179, 184, 240, 243, 252, 261, 171.

Other times, United agents calling numbers previously marked "wrong number" reached non-members responsible for the care and health-related decisions of members.  In some calls, the recipient was expressly identified as an authorized representative, *e.g.*, Mugler Decl. Exs. 202,

229; in others, the recipient stated that he knows or "takes care of" of the member and evidently had agreed to receive calls on the member's behalf, *id.* Exs. 198, 207, 115, 112, 210, 239.

Together, these many examples—drawn from a sampling of available recordings—render untenable, or at least put squarely at issue, the notion that the user of the phone number did not consent to be called by United. Likely recognizing as much, Plaintiff has eliminated nearly 100% of the numbers associated with available recordings of the calls in this category.

**ii. Incoming calls from "wrong" numbers.** That problem becomes all the more apparent in light of *incoming* calls to United from numbers previously marked "wrong number." Again, if Plaintiff's view of the "wrong number" code were correct, then a number marked "wrong" on Day 1 would not be calling United back on Day 2 to discuss member-related issues. But the new evidence repeatedly shows just that. Members called United even after "wrong number" codes to:

- arrange transportation to or from appointments, Mugler Decl. Exs. 268, 287, 304, 305, 349, 302, 311, 278;
- identify or replace their primary care providers, Mugler Decl. Exs. 269, 272, 277, 312, 322, 331, 330, 290;
- resolve payment issues, Mugler Decl. Exs. 271, 273, 296, 291, 294, 323, 324, 339, 334, 306,357;
- identify in-network care providers, Mugler Decl. Exs. 285, 289, 283, 299;
- review or confirm the scope of their coverage, Mugler Decl. Exs. 270, 307, 297, 295, 327, 329, 337, 325, 345, 280, 320;
- seek assistance with prescriptions, Mugler Decl. Exs. 350, 300, 298, 292, 342, 318;
- discuss a claim or request for approvals, Mugler Decl. Exs. 288, 282;
- request replacement of or resolve problems with cards, Mugler Decl. Exs. 316, 317, 301, 286, 358, 319, 333;
- update personal or account information, Mugler Decl. Exs. 275, 308, 346, 293, 328, 344; and
- renew old plans or enroll in new ones, Mugler Decl. Exs. 309, 308, 340.

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 21

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

And there are many more examples of members' calling United from phone numbers previously coded "wrong number" to seek information or resolve issues. Mugler Decl. Exs. 274, 284, 343, 313, 315, 336, 279, 347.

Moreover, in many cases, incoming calls were placed by family members, caregivers, or agents *on behalf of* United members, raising (at a minimum) issues about who had agreed to be contacted in connection with the member's plan. In one call, the fiancé of a member called to discuss the resumption of home healthcare. Mugler Decl. Ex. 276. In another, the mother of a member called to discuss payment for an eye-doctor visit. *Id.* Ex. 326. The daughter of two members asked for the fax number to which she could send the powers of attorney she had received from her parents. *Id.* Ex. 314. A caregiver called to change the member's address and identify his assigned caseworker. *Id.* Ex. 332. And so on. *See also id.* Exs. 310, 338. Further, in many calls, agents or member-services representatives conveyed requests on behalf of members. *Id.* Exs. 341, 335, 281, 321, 348, 306.

### 3. New evidence and recent developments have dramatically undermined Plaintiff's reverse-lookup method.

In certifying the wrong-number class, the Court concluded that Plaintiff's reverse-lookup method, when "cross-checked" using information obtained from carrier subpoenas, would "provide[] a class-wide means of distinguishing between members and non-members," and would thereby "avoid[] the consent issue." Dkt. 266 at 18. Given developments since the certification order, that is no longer a viable conclusion.

For one thing, evidently not even Plaintiff believes the reverse-lookup method is how members and non-members should be distinguished. Plaintiff has submitted a proposed class list, excluding thousands of numbers that (in his view) do not "meet the class definition." Mugler Decl. ¶¶ 4-5; *id.* Ex. 359. But Plaintiff admits the reverse-lookup method played no part in excluding supposed members from the wrong-number class (and, indeed, that his expert hasn't performed the reverse-lookup analysis yet at all). *Id.* Ex. 359. Plaintiff instead appears to be using reverse-lookup only to identify contact information for people that he has unilaterally determined, using some *other* process, are part of the class.

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 22

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000

For another, the carrier subpoena process returned names of account holders for only 49% of all phone numbers in the wrong-number class. Kwon Decl. ¶ 20. For much of the class (and thousands of individual members), then, there is no data to perform the cross-checking function this Court emphasized, and neither Plaintiff nor his expert has provided any other way to confirm whatever the reverse-lookup method will yield. Moreover, for the half of the class for which the subpoena process returned names of account holders, the data cannot eliminate the need for individualized determinations—it may provide a name of who pays the phone bill, but it doesn't identify all authorized users (for instance, in the case of group or family plans) or give the factfinder any basis to determine whether the account holder or any other user cares for or is associated with a United member and thus agreed to be contacted on the member's behalf. *Id.* ¶¶ 15-16.

Moreover, where information *was* returned from the carrier subpoena process, it undercuts rather than bolsters the reverse-lookup method. For phone numbers in the wrong-number class for which both the subpoena process and the reverse-lookup method returned results, those results differed over half the time. Kwon Decl. ¶¶ 27-29. This mismatch further confirms that the reverse-lookup process is not a reliable way of identifying which phone numbers were associated with United members at the time of each call. A final demonstration that the subpoena data does not eliminate the need for individualized factfinding comes from a comparison of United's membership records to the carrier subpoena data. That comparison revealed 1,645 people with names in the subpoena data that matched names of United members at the time of a "wrong number" call. Kwon Decl. ¶ 34. In Plaintiff's class list, many of those people have been eliminated—but 474 remain. *Id.* That means, in Plaintiff's view (and contrary to United's), those 474 were *not* members. The factfinder will have to resolve the parties' dispute about whether each of those 474 people was a United member at the moment of each relevant call, and there is no way to do that without individualized inquiry.

**C. This new evidence warrants decertification.**

When a class action "would involve adjudicating issues specific to each class member's claim," those individualized issues will predominate over common questions and render class

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 23

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

adjudication unmanageable. *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1139-40 (9th Cir. 2022). And in TCPA cases like this one, consent is often the driving force that makes class adjudication inappropriate, as "the need to inquire into the parties' specific statements and actions . . . eliminates classwide proof" on consent. *Silver v. Pa. Higher Educ. Assistance Agency*, 2020 WL 607054, at *17 (N.D. Cal. Feb. 7, 2020).

The consent issues that the new evidence reveals are of the exact type that have led courts in similar TCPA cases to conclude that Rule 23's requirements are not satisfied. For example, in *Johnson v. Yahoo! Inc.*, 2018 WL 835339 (N.D. Ill. Feb. 13, 2018), the court initially certified a TCPA class of people who received automatic text messages, concluding "that determination of consent was susceptible to class-wide proof" on the ground that the defendant's records could be used to identify phone numbers associated with people who had provided prior consent by agreeing to the defendant's terms of service. *Id.* at *4. But discovery revealed that determining whether class members had agreed to the terms of service would require exploring "the facts surrounding each person" because "the requisite identity-match may be dependent on class member testimony." *Id.* at *3. That evidence made clear "that proving consent requires individualized analysis such that the class does not meet the predominance requirement." *Id.* at *4. Given the newfound "showing that individualized consent inquiries will predominate," the court concluded that "[d]ecertification . . . is the appropriate step." *Id.*

Similarly, in *Blair v. CBE Group, Inc.*, 309 F.R.D. 621 (S.D. Cal. 2015), the court denied certification of three classes, noting that "the predominance inquiry in TCPA actions often turns on whether individualized inquiries—rather than generalized proof applicable to the entire class—are required to demonstrate an individual class member's prior express consent." *Id.* at 628 (collecting cases). The plaintiffs in *Blair* asserted that because the defendant had a policy of recording whether a calling agent had received consent, the defendant's "own records c[ould] reveal whether a class member provided consent." *Id.* at 630. But the evidence contradicted that assertion—for instance, the defendant pointed to a call in which the plaintiff had consented to be called at an updated phone number, but for which the consent was not recorded in the defendant's records. *Id.* at 629-30. The court found that this example illustrated that individual factual

DEFENDANT'S MOTION TO DECERTIFY THE CLASSES
No. 2:19-cv-00175 — Page 24

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

1    inquiries would be required to establish whether consent was provided, "and such inquiries would

2    unquestionably predominate over any common issues." *Id.* at 631.

3        And in *Selby v. LVNV Funding, LLC*, 2016 WL 6677928 (S.D. Cal. June 22, 2016), the

4    court denied class certification in a TCPA case because the defendants produced records of calls

5    showing that "at least some debtors provid[ed] prior express consent." *Id.* at *10. The defendants

6    there, in part by "listening to the call recordings" of conversations, identified fifteen calls for which

7    the recipient had agreed to receive subsequent calls. *Id.* Because the factfinder would have needed

8    to analyze individually each class member's records and interactions with the defendants to

9    determine whether consent had been given, the court ruled "that individualized inquiries into

10   consent will predominate." *Id.* at *10-11.

11       These same sorts of individualized consent issues have led courts of appeals across the

12   country to reject class certification. Take *Sandusky Wellness Center, LLC v. ASD Specialty

13   Healthcare, Inc.*, 863 F.3d 460 (6th Cir. 2017), in which the Sixth Circuit affirmed the denial of

14   class certification in a TCPA case after holding that determining whether class members consented

15   to be called would require individualized evidence "sufficient to keep common questions from

16   predominating." *Id.* at 468-69. Similarly, in *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318 (5th

17   Cir. 2008), the Fifth Circuit reversed an order granting class certification after holding that "there

18   [wa]s no class-wide proof available to decide consent" and that "only mini-trials c[ould] determine

19   th[at] issue." *Id.* at 328-29. In *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839 (7th

20   Cir. 2022), the Seventh Circuit affirmed the denial of class certification, again holding that where

21   resolving consent "require[s] individual scrutiny," that "method of determining the answer" is

22   inconsistent with Rule 23(b)(3)'s predominance requirement. *Id.* at 844-45. And in *Bais Yaakov

23   of Spring Valley v. ACT, Inc.*, 12 F.4th 81 (1st Cir. 2021), the First Circuit agreed that, without a

24   suitable class-wide basis to resolve the issue of prior consent, "individual issues of permission

25   would predominate over common questions." *Id.* at 92. These cases all share the same insight:

26   where "identifying which individuals consented would undoubtedly be the driver of the litigation,"

27   and where that inquiry will turn on facts specific to particular calls or recipients, Rule 23(b)(3)

28   precludes certification. *Sandusky*, 863 F.3d at 468.

The new evidence here supports a similar outcome.  Attached to this motion are over 350 examples of calls irreconcilable with the view of the "do not call" and "wrong number" codes that undergird the certification order.  Those examples alone provide *far* more extensive evidence of defects in Plaintiff's theory of certification than the showings that justified decertification in other cases.  *See, e.g.*, *NEI Contracting*, 2016 WL 2610107, at *7 (nine examples); *Selby*, 2016 WL 6677928, at *10 (fifteen examples).  And when combined with the other developments here— including the return rates from the carrier subpoena process and Plaintiff's voluntary ejection of thousands of people from the classes—that evidence makes decertification all the more appropriate.

## V.    CONCLUSION

The Court should decertify the two classes it previously certified (Dkt. 266).

Dated:  July 22, 2024                     Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:  s/ *Timothy W. Loose*
Timothy W. Loose, *Admitted Pro Hac Vice*

333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  (213) 229-7000
Email:  tloose@gibsondunn.com

LANE POWELL PC

By:  s/ *Erin M. Wilson*
Barbara J. Duffy, WSBA No. 18885
Erin M. Wilson, WSBA No. 42454
Devon McCurdy, WSBA No. 52663
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, WA 98111-9402
Telephone:  (206) 223-7944
Email:  duffyb@lanepowell.com
Email:  wilsonem@lanepowell.com
Email:  mccurdyd@lanepowell.com

DEFENDANT'S MOTION TO DECERTIFY
THE CLASSES
No. 2:19-cv-00175 — Page 26

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000

BOIES SCHILLER FLEXNER LLP


By:  s/ *Maxwell V. Pritt*
     Maxwell V. Pritt, *Admitted Pro Hac Vice*

     44 Montgomery Street, 41st Floor
     San Francisco, CA 94104
     Telephone:    (415) 293-6800
     Email:  mpritt@bsfllp.com

     Samuel C. Kaplan, *Admitted Pro Hac Vice*

     1401 New York Avenue, NW
     Washington, DC 20005
     Telephone:  (202) 237-2727
     Email:  skaplan@bsfllp.com

*Attorneys for Defendant*
*United HealthCare Services, Inc.*

I certify that this memorandum contains 9,482 words, including 340 words in excerpted images, in compliance with the Local Civil Rules and this Court's order of July 17, 2024 (Dkt. 309).

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000